**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Henry J. KALITA, Defendant-Appellant.**

**No. 82–1258.**

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1983.

Decided July 8, 1983.

Rehearing Denied Aug. 10, 1983.

Paul M. Brayman, Chicago, Ill., for defendant-appellant.

Daniel Wm. Gillogly, Robert W. Tarun, Dept. of Justice, Washington, D.C., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and POSNER, Circuit Judges, and JAMESON, Senior District Judge.[*]

JAMESON, Senior District Judge.

Henry J. Kalita was charged in a four count indictment with wilfully failing to file income tax returns for the years 1975, 1976, 1977, and 1978, in violation of 26 U.S.C. § 7203. In a jury trial he was found guilty on all counts and has appealed his conviction.[1] We affirm.

---

[*] Hon. William J. Jameson of the District of Montana, sitting by designation.

[1] Kalita was sentenced to one year imprisonment on Count One and to three consecutive one-year periods of probation on the remaining counts, to be served consecutively to the imprisonment.

## I. *Factual Background*

### A. *Returns Filed*

After filing proper tax returns for several years, Kalita in 1976 submitted a return for 1975 showing Federal Income Tax withheld in the amount of $350 and claiming a "refund" in that amount. He objected on Fourth and Fifth Amendment grounds to completing the balance of the 1040 Form. Attached to the Form was a "Petition and Protest" and numerous other documents, totaling over 90 pages, but containing no income information. Similar returns were filed in 1976, 1977, and 1978, except for those years the returns did not show any amount withheld.[2] In each return in place of any amounts appears the notation "Object 4th & 5th Amends." or "Object self-incrimination." Appellant states in his brief that in each return "he asserted constitutional privileges in refusing to answer questions and provide income information."[3]

Following the filing of each return, Kalita received a notice from the Internal Revenue Service that the return filed was not acceptable, did not contain information required by law, and did not comply with the Internal Revenue Code requirements.

### B. *Agreement with Pepperidge Farm*

On March 29, 1971, Kalita entered into a Consignment Agreement with Pepperidge Farm Incorporated, a manufacturer and distributor of bakery products. Under this agreement Kalita was given exclusive franchise territory in the Chicago area within which to sell and distribute Pepperidge Farm products. Provisions of the contract relevant to this case include the following:

2. QUANTITIES CONSIGNED. Bakery will consign and deliver to Consignee and Consignee will accept sufficient quantities of Consigned Products to maintain at all times an adequate and fresh supply thereof in all retail stores in the territory which request such products and whose accounts are not demonstrably unprofitable; provided, however, that Bakery reserves the right to allocate its products as nearly proportionately as practicable if the overall demand for its products exceeds its production. Consignee shall hold and care for all Consigned Products as the sole and exclusive property of Bakery. Title to all Consigned Products shall be vested in, subject to, and under the control of Bakery until sold by Consignee.

3. PROCEEDS AND RECORDS OF SALES. The Consignee will pay promptly each week on the day specified by the Bakery for all Consigned Products sold by him during the preceding week. If any chain store organization refuses to pay or to permit its store managers to pay the Consignee directly for Consigned Products distributed by him and, instead, requires the Bakery to submit a consolidated bill to a central or district office of such chain, the Consignee shall be entitled to deliver to the Bakery for credit to his account all charge tickets signed by such store managers; provided, however, that the Bakery may in its discretion (a) refuse such credit on any charge ticket not received by the Bakery within the time prescribed in its published billing schedule then in effect and (b) debit the Consignee's account with any charge ticket which it is unable to collect within a reasonable time. Consignee guarantees the payment of all bills and accounts for Consigned Products sold by Consignee under this agreement. Consignee will keep such records of Consigned Products received and sales made as Bakery may from time to time request; Bakery may inspect such records and Consigned Products at such times as Bakery may select.

*       *       *       *       *

8. CHAIN STORE ACCOUNTS. If any chain store organization requires that authorization for the distribution of Consigned Products to the chain's retail stores in the

---

2. Attached to the 1976 return was an affidavit reciting, *inter alia,* that affiant had "received no income in lawful money since March 18, 1968."

3. As set forth later in this opinion, in 1977 Kalita filed amended returns for the years 1969 through 1976, but did not furnish any income information.

territory shall be obtained through a central or district office located outside of the territory, or only in conjunction with the distribution of Consigned Products to its retail stores in other territories, the Bakery will co-operate with the Consignee in procuring such authorization. If any chain store organization refuses to pay or to permit its store managers to pay any Consignee directly for Consigned Products and, instead, requires the submission of a consolidated bill to a central or district office of the chain, the Bakery will handle the billing and the collections for all such products, subject to the terms of Paragraph 3.

9. PROHIBITED SALES AND DELIVERIES. The Consignee will not sell or deliver any Consigned Products directly to consumers or to any other purchasers except retail stores within the territory and such hotels, restaurants, clubs and similar organizations within the territory as the Bakery may authorize in writing. Also, the Consignee will not, without like authorization, make deliveries of Consigned Products to any chain store organization via a central or district warehouse or in any manner other than directly to its retail stores. If, despite the best efforts of the Consignee and the Bakery to obtain permission from any chain to make deliveries directly to its retail stores, such chain refuses to handle Consigned Products except via warehouse deliveries, the Bakery shall have the right in its discretion to sell and deliver its products directly to such chain for its own account via warehouse deliveries as long as such refusal remains in effect.

. . . . .

15. INDEPENDENT BUSINESSMAN. The Consignee is a self-employed independent businessman, not an agent or employee of the Bakery, and has no authority other than to sell products consigned to him hereunder, express or implied, to do or perform any act or thing or to make any warranty or representation or promise or commitment of any character which will be binding upon the Bakery or for which it will be responsible, and he will refrain from any conduct inconsistent with the terms of this paragraph.

## II. *Proceedings in District Court*

### A. *Testimony of John Silk*

John Silk, Manager of Sales Accounting for Pepperidge Farm for the preceding 16 years, testified at trial regarding the consignment agreement. He stated that basically a distributor consignee such as Kalita sells two ways: (1) to what Pepperidge Farm considers its customers, chain stores and commissaries; and (2) to his other retail customers, which are "Ma and Pa stores." Pepperidge Farm would ship to the consignee (also known as franchisee or distributor) certain products for which the consignee had an obligation to service Pepperidge Farm customers with the products on hand. He also used his inventory to service his own accounts at other retail stores.

Kalita, as with any consignee, would be billed for the products on an inventory depletion system. Pepperidge Farm issued pre-printed tickets used to record the merchandise a consignee delivered at a chain store. One copy of the ticket was left with the store, one was sent to Pepperidge Farm, and one was retained by the consignee. The consignee was given credit for these sales against the money he owed Pepperidge Farm for the products. The consignee would be paid a commission on the chain store and commissary accounts. With respect to these accounts, Pepperidge Farm assumed the responsibility for billing and collection of payments and set prices for its products. The consignee was also allowed to establish his own accounts, and Pepperidge Farm had no knowledge of these customers or the prices charged them.

Silk testified that for 1975 Kalita received compensation or "an approximate profit" somewhere between 19% and 23% on the consignee's cost of products sold to chain stores. The amount of money Kalita made servicing his own retail business was unknown to Silk.

During 1975 Pepperidge Farm used a three-part document called a "Notification of Payment" form, also referred to by Silk as a "distributor invoice". On this form was recorded on a weekly basis the products for which a consignee was accountable and the chain store tickets for which he was given credit. The form also provided entries the consignee used to settle his accounts with Pepperidge Farm.

The Government offered in evidence all of the weekly forms for 1975 which Silk could locate (a few were missing). At the bottom of each form was an entry "Net Per Tickets", showing the total amount of product delivered by a consignee to a chain store and total amount for which the consignee was billed for a particular week. Silk also produced the weekly forms for the period January-July, 1976. Kalita's share during this period was also between 19% and 23% of chain store sales.

In August, 1976, Pepperidge Farm changed its billing system. Among the changes were the payment of a fixed 20% commission for delivering products to Pepperidge Farm customers and a recasting of the "distributor invoice" to a "consigned inventory recap." The new form also included the total of all chain store tickets turned into Pepperidge Farm under the caption "total chain credits" (previously "Net Per Tickets") and specifically set forth the amount of commission earned under the caption "Payable Amount." The weekly inventory recap forms for the periods August-September 1976 and all of 1977 and 1978 were received in evidence as Government exhibits. The new form also set out the calculation showing inventory for which Kalita was responsible, less his chain credits and commissions.

Although Kalita earned commissions at the fixed rate of 20% of the chain store sales, he did not always receive a check for the amount earned. If the sales to chain stores exceeded 80% of his sales for a week, he was issued a check. If his chain store sales were less than 80% of the total sales, Kalita would owe money to Pepperidge Farm. His commissions were used to offset the money owed to Pepperidge Farm for products which were sold to his own accounts.

Silk testified further that in 1976 Pepperidge Farm began to issue 1099 Forms, a form required by the Internal Revenue Service for commissions paid to a third party in excess of $500. In preparing these forms, Pepperidge Farm totaled each year's commissions, as well as some miscellaneous allowances for transportation and postage. The amounts shown on the 1099 Forms were determined by calculating the total chain store sales and crediting the distributor consignee with 20% of the net. The forms issued to Kalita for the years 1976, 1977 and 1978, which were received in evidence as Government exhibits, showed under "Commissions and fees to non-employees" the amounts of $13,215.79; $31,340.37; and $38,443.22 respectively. These amounts represented the total of the amounts for which Kalita was given credit on his weekly consignment recaps. Copies were sent by Pepperidge Farm to Kalita.

### B. Testimony of Lucille Nash

Lucille Nash, a revenue agent with the Internal Revenue Service, testified with respect to computations of Kalita's gross income which she had made, based on the documents received in evidence and Silk's testimony.

Based on the 1040 Form Kalita submitted for 1975, Nash determined that Kalita was single and would have been required to file an income tax return if his gross income exceeded $2,350. Using Pepperidge Farm's weekly invoice sheets for 1975, she added all the "net amount per ticket" figures and multiplied by both 19% and 23%. She arrived at commission incomes for Kalita of $14,991.35 and $18,147.43 respectively.

In 1976 Nash again determined that Kalita was single and was required to file an income tax return if his gross income exceeded $2,450. Using the weekly invoice sheets, she totaled the "net per ticket" figures for the period January through July, 1976, multiplied by 19% and 23%, which resulted in commission incomes for this pe-

riod of $13,194.81 and $15,972.66. Relying on the 1099 Form for the balance of 1976, she arrived at a total commission income for 1976 between $26,410.60 and $28,435.40.

For 1977 the amount of gross income which necessitated filing an income tax return was $2,950. The 1099 Form showed commission income of $31,430.37. Several weekly recap sheets for 1977 were missing, but Nash's calculations were close to those appearing on the 1099 Form. Again, based on the assumption that Kalita was single, he was required to file a return for 1978 if his gross income exceeded $2,950. The amount of commissions reflected on the 1099 Form for 1978 was $38,443.22.

Nash explained the difference between gross receipts and gross income, stating that for businesses gross income is computed by subtracting the cost of goods sold from gross receipts. She testified that gross income includes commissions and other income from businesses. She also testified that there was no information on any of the returns filed by Kalita for the years 1975, 1976, 1977 and 1978 from which a tax could be computed.

On cross-examination, Nash testified that if Kalita were an "independent distributor simply purchasing at a 20 per cent discount," there was nothing in the Pepperidge Farm documents reflecting his gross income. She said that if the figures she had given were gross receipts and not gross income, they would be meaningless in terms of whether Kalita was required to file.

### C. *Motions for Acquittal*

At the close of the Government's case, the defendant made a motion for a directed verdict of acquittal on the ground, among other things, that the Government had not proved any "gross income" for the years in question. This motion was denied, as was a similar motion at the close of all the evidence.

### III. *Contentions on Appeal*

Appellant contends that (1) the district court erred in denying his motions for a directed verdict in that the Government failed to prove that he had earned any gross income for the tax years in question; (2) he was denied due process of law and the right to effective representation of counsel by being represented inadequately at trial; (3) the court erred in telling the jury that they had to reach a unanimous verdict and by refusing to give defendant's offered instruction; and (4) the court erred in admitting IRS records showing that appellant filed no income tax returns for 1979 and 1980.

### IV. *Proof of Gross Income*

Was the evidence sufficient to prove that Kalita earned enough gross income to require him to file tax returns for the years in question?

As noted above, Kalita filed proper tax returns for several years prior to 1975. During the years he operated under the Pepperidge Farm agreement, his initial 1040 returns showed the following:

| | |
|---|---|
| 1971: "Business Income" | $ 8,355.74 |
| (From "Net Profit", Schedule C) | |
| "Adjusted Gross Income" | 4,972.39 |
| 1972: "Business Income" | $10,015.87 |
| (From "Net Profit", Schedule C) | |
| "Adjusted Gross Income" | 9,441.97 |
| 1973: "Business Income" | $10,909.50 |
| (From "Net Profit", Schedule C) | |
| "Adjusted Gross Income" | 9,910.00 |
| 1974: "Business Income" | $ 3,147.70 |
| (From "Net Profit", Schedule C) | |
| "Adjusted Gross Income" | 2,952.74 |

In 1977, however, Kalita filed amended returns showing "adjusted gross income" in the following amounts: 1971, $11.00; 1972, $14.50; 1973, $14.00; and 1974, $22.00. Amended returns were also filed for 1975, showing an adjusted gross income of $8.00; and for 1976, an adjusted gross income of $11.50. There was a notation on each of these returns that the amounts shown were in "lawful (gold and silver) Dollars", with certain exceptions, and numerous comments, including objections under the Fourth and Fifth Amendments. Apparently similar amended returns were not filed for 1977 and 1978; and no returns were filed for 1979 and 1980.

In the return for 1976, the line for "adjusted gross income" was followed by a

double asterisk (" ** "). At the bottom of the return was this notation (among others):

** This figure means specific objection is made under the 4th and 5th amendments to the constitution of these United States of America—To the question as to Federal Reserve Notes, and that similar objection is made to the question under the 1st, 4th, 5th, 7th, 8th, 9th, 10th, 13th, 14th, and 16th Amendments.

The 1977 and 1978 returns contain the notation "Object, self incrimination".

In all of the 1040 Forms filed by Kalita for the years 1971 through 1978, together with numerous letters, copies of court decisions, essays, and other documents, asserting various constitutional and political theories, he did not at any time contend that he did not have sufficient gross income to require the filing of a proper return. The contention that the Government had failed to show any gross income for the tax years in question was first asserted at his trial.

In contending that the Government failed to prove that appellant earned any gross income for the tax years in question, appellant argues that he was an "independent businessman" and not a "commissioned salesman," and that the credit or profit of 19% to 23% received for 1975 and 20% for the remaining years was a "discount" rather than a "commission". Appellant offered no evidence with respect to his earnings, but relied solely on the alleged failure of proof.

In determining whether there was sufficient proof of gross income for the tax years in question, we emphasize that Kalita did in fact file "returns", without income information, for each of the years in question (and amended returns for three of those years), from which it may reasonably be assumed that he recognized that his "gross income" was sufficient to require him to file a return. In addition he had filed returns for the three prior years he operated under the consignment agreement and in each of those years there was a tax due, which he paid.

We agree with the Government that there is nothing inherently inconsistent in an independent business man earning commissions reportable on Form 1099. The term "self-employed independent businessman" in paragraph 15 of the agreement, quoted above, simply makes it clear that Kalita was not an agent or employee of Pepperidge Farm and had no authority to perform any act or make any commitment "which will be binding upon the Bakery." Moreover, paragraph 15 must be construed with other provisions of the consignment agreement. For example, under paragraph 2, title to all consigned products is vested in and "under control of Bakery until sold by Consignee." Under paragraph 3, the consignee must keep such records as the Bakery requests, and Pepperidge Farm may take "physical inventory" of its products "whenever and as often as Bakery desires such to be advisable." Paragraph 8 contains special provisions for "chain store accounts," and paragraph 9 prohibits sales and deliveries to any purchasers "except retail stores" and "such hotels, restaurants, clubs and similar organizations . . . as Bakery may authorize in writing."

The fact that Kalita was described in the Consignment Agreement as a "self-employed business man" and "not an agent or employee of the Bakery" does not preclude the payment of "commissions", which must be reported on Form 1099 if they exceed $500 and which are a part of the "gross income" to be shown in Form 1040. It is clear from Silk's testimony that the parties to the agreement considered the payments commissions rather than discounts.

▮ On the basis of the facts set forth above and the testimony of witnesses Silk and Nash the jury could properly find that Kalita had sufficient gross income for each of the years in question to require him to file a tax return and could find him guilty on each count beyond a reasonable doubt. The district court did not err in denying Kalita's motions for a directed verdict.

## V. *Representation of Counsel*

Appellant contends that he was denied due process of law and the right to effec-

tive representation of counsel by being inadequately represented at trial. In *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7 Cir.1975), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975), this court held that the Sixth Amendment "guarantees a criminal defendant legal assistance which meets a minimum standard of professional representation." In determining whether that standard is met, "the court must look at the totality of circumstances in the particular case." *United States v. Phillips,* 640 F.2d 87, 92 (7 Cir. 1981), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981). We are satisfied from our examination of the record that Kalita's trial counsel more than met the minimum standards of professional competence set forth in *Twomey* and *Phillips* and that Kalita was not denied effective representation.

Kalita represented himself from March 17, 1981 until July 12, 1981, when Michael G. Parham filed his appearance as co-counsel. Kalita played an active role in his own defense both before and after retaining Parham. He filed a "Petition for Writ of Habeas Corpus" on March 24, 1981, and a Motion to Dismiss on April 24. On September 21, 1981, he filed a "Notice of Co Counsel and Personal Jurisdiction," giving "notice to this court, that Mr. Michael Parham has been hired as co counsel on my behalf."[4] Kalita filed two motions on December 8, 1981—one entitled "Motion to Dismiss Subpoena Duces Tecum, Pursuant to Rule 16(d)(1)", and the other entitled "Motion to Dismiss for Lack of Jurisdiction and for Court to Take Judicial Notice Pursuant to Rule 201 d Federal Rules of Evidence." We find no evidence in the record that counsel at any time took any action contrary to Kalita's expressed desires.

Kalita argues on appeal that his counsel was not adequately prepared for trial, noting that although he had six months to prepare, he filed a motion for a continuance on December 11, 1981, four days before the case was set for trial. The motion was denied. On December 15, the date the case was set for trial, counsel informed the court that he had been engaged in a number of other trials until the day before and had not had adequate time to prepare this case for trial. A continuance was granted to December 17.

■ Appellant cites as perhaps "the first signal that Mr. Parham was unprepared" the fact that he deferred his opening statement until the close of the Government's case. Considering the nature of the case and in particular the nature of Kalita's defense, counsel could understandably desire to hear the Government's evidence before committing his client to a specific position before the jury.

■ Appellant relies upon isolated comments made by Mr. Parham including a statement to the court that he was "not a contract lawyer" and "would certainly like some time to further look into this with another attorney who can advise me in this matter." From our examination of the entire record, however, including in particular Parham's cross-examination of the Government witnesses, his argument on the two motions for a directed verdict of acquittal, his opening statement to the jury, his offered instructions, and his argument to the jury, we are satisfied that Kalita was adequately represented. It is significant also that counsel on appeal have adopted trial counsel's "gross income" theory and also rely upon trial counsel's objection to one of the instructions given by the court.

## VI. *Instructions on Unanimous Verdict*

■ Appellant argues that the court erred in telling the jury at the beginning of the trial:

> Your function is to find the facts in the case from the evidence, and then to apply

---

4. Kalita stated in this notice Judge McGarr had stated that Mr. Parham could not be Kalita's co-counsel, but had to be his counsel and that was "something which I must challenge. I am the person who hired Mr. Parham as my co-

counsel. I have paid and continue to pay· all costs and expenses. Mr. Parham has agreed to act as my advisor and argue any and all motions which I may think are required."

the law which I give to you to those facts, and reach a verdict, which is unanimous. You have to have a unanimous verdict in this Court, either for or against guilt.

Appellant suggests that the error could have been "somewhat cured" by giving his offered Instruction No. 9, which stated in part that

... you are not under any pressure to reach the opinion of another juror in order to reach a verdict. If you are personally convinced that the evidence shows what you believe it to show, then by all means, stick to your convictions regardless of the opinion of your fellow jurors. There is no compulsion to bring in a verdict merely for the sake of such verdict.

In its charge to the jury at the close of the trial, the court gave the standard instruction on jury unanimity approved in this circuit which reads:

The verdict must represent the considered judgment of each juror. Your verdict, whether it be guilty or not guilty, must be unanimous on each count.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to reexamine your own views and change your opinion if you come to believe it is wrong. But do not surrender your honest beliefs about the weight or effective [sic] evidence solely because of the opinions of your fellow jurors or for the purpose of returning a unanimous verdict.

The twelve of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement which is consistent with the individual judgment of each juror.

This instruction, at the close of the trial (and which the jury was permitted to take to the jury room) made it clear that the jury should "make every reasonable effort to reach a verdict," but that the jurors should not surrender "their honest beliefs" solely "for the purpose of returning a unanimous verdict." We cannot agree that the instructions as a whole had any coercive effect on the jury.

## VII. *Evidence that Appellant Filed no Returns for 1979 and 1980*

■ Finally, appellant contends that the court erred in admitting, over his objection, evidence that he did not file income tax returns for 1979 and 1980. Appellant argues that the only reason for presenting this evidence was to create the impression that he is a tax evader and inflame the jury to return a guilty verdict.

The Government responds that the failure to file for subsequent years was highly probative of Kalita's willfulness in failing to file and that the Government at no time argued or suggested that Kalita was a tax evader. The evidence was admitted as a part of the testimony of an IRS agent that Kalita had been advised by letter each year in which he filed his protest returns that the returns were not acceptable and did not comply with the Internal Revenue Code. Notwithstanding these letters Kalita continued to either file protest returns or no returns at all.

Moreover, the Government argues that when this evidence was admitted, it did not know whether the defendant would call witnesses, and if so, who they would be or what they would testify. Kalita did not take the stand himself, but two of his three witnesses, a paralegal friend and the pastor of the Church of Christian Liberty and Academy of Prospect Heights, of which Kalita had been a member since 1975, testified regarding Kalita's involvement in the "tax movement". They testified that Kalita enjoyed a good reputation for truth and veracity and related various conversations with Kalita. The pastor also testified, among other things, about the church's instructions regarding taxation, his counseling of parishioners, and Kalita's understanding of the history of the income tax. In addition to contending that there was no proof of "gross income" counsel relied heavily on the testimony of these witnesses in

arguing Kalita's state of mind and motivation in his argument to the jury.[5]

In holding that evidence of failure to file returns for prior and subsequent years was properly admitted, this court in *United States v. Stout,* 601 F.2d 325, 329 (7 Cir. 1979), *cert. denied,* 444 U.S. 979, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979), said in part:

> This evidence supports a finding that the defendant knew that he was required to file returns and that therefore when he failed to file them, he did so willfully.
>
> We have often approved the admission of such evidence. *United States v. Farris,* 517 F.2d 226, 229 (7th Cir.1975), *cert. denied,* 423 U.S. 892, 96 S.Ct. 189, 46 L.Ed.2d 123 (1975); *United States v. McCabe,* 416 F.2d 957, 958 (7th Cir.1969). See also, F.R.Evid. 404(b).

Here too the failure to file returns for 1979 and 1980 was relevant on the issue of wilfulness.

### VIII. *Conclusion*

We find no reversible error and affirm the judgment of conviction on each count.

---

**5.** It is true that appellant did not rely on the testimony of the defense witnesses on this appeal. Rather his opening brief states that, "The defense presented three witnesses, whose testimony has no significance on the issues raised on appeal."