**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William BRADSHAW,
Defendant-Appellant.**

No. 82–2540.

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1983.
Decided Oct. 19, 1983.

Barry A. Spevack, Michael D. Monico, Ltd., Chicago, Ill., for defendant-appellant.

Sheila A. Markin, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before ESCHBACH and COFFEY, Circuit Judges, and CAMPBELL, Senior District Judge.*

COFFEY, Circuit Judge.

The defendant-appellant, William Bradshaw, was convicted of conspiring to steal goods moving in interstate commerce and the underlying substantive offense of stealing goods moving in interstate commerce in violation of 18 U.S.C. §§ 371 and 659. From those convictions Bradshaw raises the following issues on appeal: (1) whether the district court failed to adequately inform Bradshaw of the dangers of multiple representation as required under Fed.R.Crim.P. 44(c); (2) whether Bradshaw's attorney operated under an actual conflict of interest that affected his representation of Bradshaw thereby violating Bradshaw's Sixth Amendment right to conflict-free counsel; (3) whether an incomplete answer of a government witness, successfully objected to on hearsay grounds, improperly implied that other people had linked Bradshaw to the theft; and (4) whether there was sufficient evidence to convict. Because we do not find the defendant's arguments meritorious, we affirm the convictions.

## I.

This case involved the theft of the contents of a Blue Arrow trailer traveling in interstate commerce from Flint, Michigan via Chicago to Sioux Falls, South Dakota. The contents of that trailer amounted to approximately $43,000 worth of A/C Auto Parts, which were stolen while the trailer was in Chicago. The sole issue to be determined at trial was whether the defendants, William Bradshaw and James Urbanski were responsible for the theft. Only the

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

defendant Bradshaw appeals his convictions.

On the date of the theft, July 4, 1980, the Blue Arrow trailer was parked at Barber Transportation Company located in Chicago, Illinois. The circumstances surrounding the theft indicated that the party or parties who participated in the theft of the trailer not only had knowledge concerning the operation of tractors and semi-trailers, but also knew the particular practices and procedures of Barber Transportation Company since the thieves were able to obtain the vehicles' keys and easily avoid Barber's security measures. The testimony showed that the defendant Urbanski worked as a terminal manager at Lincoln Transfer Company, located immediately adjacent to Barber Transport. The evidence also demonstrated that Urbanski was familiar with Barber Transport's dispatch area where keys and trailer documentation materials were kept. In addition, it was shown that Bradshaw was an experienced truck driver who at the time of the theft was laid off from his regular job, but was occasionally employed as a truck mechanic for B & B Trucking (hereinafter "B & B").

One of the witnesses to the theft testified that at 8:30 a.m. on July 4, 1980, he observed William Bradshaw's car leaving the Barber Transport terminal followed by a Barber tractor hooked to a Blue Arrow trailer. Another witness testified that at 10:30 a.m. on the same day he observed a Blue Arrow trailer parked in the vicinity of B & B Trucking (Bradshaw's place of employment at the time). That witness also stated that he had seen the defendant Bradshaw backing a Ranger Cartage truck up to the rear end of a Blue Arrow trailer. The evidence indicated that Bradshaw had access to the keys of Ranger Cartage trucks as a result of his employment at B & B. Twenty-eight pallets traced to the A/C shipment were found stacked immediately adjacent to the B & B premises. Sometime later in the morning of July 4, 1980, two of Urbanski's neighbors noticed a truck pull into his driveway. These witnesses testified that the truck was accompanied by two cars, one of which belonged to Bradshaw.

Ed Bradshaw, William Bradshaw's first cousin, who was also implicated in the theft, testified on behalf of the government. He stated that he had gone out drinking with the defendants William Bradshaw and Urbanski the night before the theft, had become very drunk and had fallen asleep in his cousin William Bradshaw's car. He testified that when he (Ed Bradshaw) finally awoke the car was at B & B.[1] He got out of the car and observed the Ranger Cartage truck parked "back to back" with the Blue Arrow trailer. He spoke with his cousin (defendant William Bradshaw). Following that conversation, he looked inside the trailer where he saw Urbanski. His cousin then asked him to move the Ranger Cartage truck which he attempted to do but could not because the truck failed to start. Sometime later, William Bradshaw asked him to watch over the B & B premises while he went out to get something to eat. After his cousin returned he left B & B in his own car. Ed Bradshaw further claimed that he had nothing to do with the actual theft of the automobile parts. Defendants Bradshaw and Urbanski, on the other hand, jointly testified that Ed Bradshaw was in reality the mastermind of the theft and that, in fact, they had been unwittingly tricked into helping Ed Bradshaw carry out the theft.

Prior to and during the trial of this action, defendants Bradshaw and Urbanski were represented, at their own request, by the same attorney, Mr. Robert J. McDonnell. Both were advised on three separate occasions, prior to trial, of their right to separate counsel as well as the pitfalls of joint representation. In their appearance before Magistrate Olga Jurco, on April 27, 1982, the magistrate undertook an extensive discussion of the problems involved in joint representation. A second inquiry was made by the district court during a pretrial hearing conducted on May 24, 1982. At

---

1. Edward Bradshaw stated at trial that he had periodically awoke while in the car, but prior to the stop at B & B, he had each time fallen back asleep.

that hearing the judge advised the defendants of their right to separate and conflict-free counsel and, in addition, stated to the defendants that they might have conflicting defenses. Finally on June 28, 1982, the government filed a motion for inquiry with respect to joint representation pursuant to Fed.R.Crim.P. 44(c). That motion asked the court to question each defendant to determine whether there was good cause to believe that no conflict of interest was likely to arise as a result of their joint representation. In response to that motion, the district court, on July 13, 1982, once more advised the defendants of their right to separate counsel and questioned them concerning the possible conflicts raised in the motion.

## II.

The defendant's first set of arguments concern his Sixth Amendment right to conflict-free assistance of counsel. There is no doubt that such a right exists. As our court stated in *United States v. Gaines,* 529 F.2d 1038 (7th Cir.1976), "[t]he sixth amendment guarantee of the assistance of counsel includes the right to counsel whose loyalty is not divided between clients with conflicting interests." *Id.* at 1043 (*citing Glasser v. United States,* 315 U.S. 60, 70, 75–76, 62 S.Ct. 457, 646, 647, 86 L.Ed. 680 (1942)). *See also Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Before proceeding into a discussion of the adequacy of the trial court's inquiry into the issue of joint representation, as required by Fed.R.Crim.P. 44(c), it seems appropriate that we consider whether Bradshaw, through his statements and representations to the magistrate and trial court, waived his right to conflict-free counsel and therefore cannot now be heard to complain about his joint representation and any conflicts that may have arisen therefrom.

■ As with other constitutional rights, the right to conflict-free counsel can be waived. *United States v. Gaines,* 529 F.2d at 1043; *United States v. Garcia,* 517 F.2d 272, 276 (5th Cir.1975). The standard for measuring an effective waiver of a consti-

tutional right was set forth in the case of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

*Id.* at 464, 58 S.Ct. at 1023. This standard was subsequently refined by the Supreme Court in *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). According to that case "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* at 748, 90 S.Ct. at 1469 (footnote omitted). *See also United States ex rel. Williams v. DeRobertis,* 715 F.2d 1174 (7th Cir. 1983) (waiver of jury trial). If a valid waiver is obtained, the defendant cannot at a later date attack his conviction based on an assertion of conflict. "A truly knowing and intelligent waiver accepted by the court will insulate a conviction from later attack." *United States v. Flanagan,* 679 F.2d 1072, 1076 (3d Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 721, 74 L.Ed.2d 948 (1983). *See also United States v. Garcia,* 517 F.2d at 276; *United States v. Gaines,* 529 F.2d at 1041; and *United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431 (7th Cir. 1983).

■ Thus, we now turn to an examination of the circumstances surrounding Bradshaw's decision to retain his trial court attorney to determine whether he did, in fact, waive his right to conflict-free assistance of counsel. When the three occasions on which both defendants were advised of their rights concerning joint representation are examined in an objective and discriminating light, it becomes apparent that Bradshaw voluntarily, knowingly and intelligently waived his right to separate and conflict-free counsel. Short of holding that

the district court was required to order Bradshaw to retain separate counsel, it is hard for us to understand how the magistrate and trial judge could have done more to avoid any possibility of conflict, or could have more thoroughly educated Mr. Bradshaw of the potential problems that might arise from joint representation.

On the first occasion, Magistrate Olga Jurco advised both Bradshaw and Urbanski of their right to separate counsel. Additionally, she noted that it was the court's obligation to fully appraise each defendant of the possible conflicts that might arise in the presentation of their defenses. During the discussion that followed, she pointed out to both defendants: (1) that defenses might be available to one which would conflict with those available to the other; (2) that conflicts might arise with respect to particular decisions that needed to be made during the trial of the case, such as whether either or both defendants should take the stand; (3) that a conflict also might arise with a respect to whether particular witnesses should be called, whether certain questions should be asked of those witnesses and whether possible cross-examination might be curtailed. She then stated that she was not able to go into the particulars of any of the possible conflicts because she was not privy to the information related in the conferences between the defendants and their counsel. However, she felt that it was important to point out to them the broad parameters where a conflict might arise. Finally, Magistrate Jurco explained, "what I want to say is that what is in the best interests of one of the defendants may not likely be in the best interest of the other defendant."

After conducting this exhaustive colloquy she asked Bradshaw if he had discussed the above-noted risks with his counsel, to which he replied that he had. She repeated that question to Urbanski who also answered in the affirmative. She then asked their counsel, Attorney McDonnell, whether he had considered the possibility of a conflict and had discussed that risk with his clients. He replied, "I have, your Honor. I have gone into it in depth with them and in my opin-

ion there could not possibly be a conflict, and if indeed I foresee anything I will immediately call in other counsel." This statement was made on the record in the presence of both Urbanski and Bradshaw. The magistrate then asked Urbanski whether he wished to have Mr. McDonnell represent him. He replied that he did. Following that response, the magistrate asked Bradshaw if this was also his wish. He replied, "[y]es, your Honor."

A second inquiry concerning joint representation was undertaken by the trial judge during a pretrial hearing held on May 24, 1982. He initially addressed Urbanski in the presence of Bradshaw. The trial judge told Urbanski that he had a right to separate counsel and that he might have a defense contrary to that of Bradshaw. He then asked Urbanski whether he still wanted to be represented by Mr. McDonnell. Urbanski replied that he did. Next the trial court asked Bradshaw whether he understood that as well. Bradshaw stated that he understood. The court then asked Bradshaw whether Mr. McDonnell had explained that he had a right to separate counsel. Again Bradshaw replied in the affirmative. Turning his attention to Mr. McDonnell, the court asked whether he had explained the existence of that right to both defendants. Mr. McDonnell stated that he had. He also told the court that if there was "even the slightest hint of a conflict" he would bring in another attorney. Finally, the court admonished Mr. McDonnell to take another "good hard look" at the situation to determine if there was any possibility of a problem and to bring in separate counsel if there was the "slightest conflict."

The trial court again addressed the issue of joint representation on July 13, 1982, in response to the government's motion for inquiry with respect to joint representation pursuant to Fed.R.Crim.P. 44(c). That motion delineated the following as possible areas of conflict as perceived by counsel for the government: (1) there were differing degrees of culpability and involvement by each defendant; (2) three of the govern-

ment's witnesses were defendant Bradshaw's brothers-in-law, and another witness was his cousin; (3) Urbanski might have a defense that conflicted with Bradshaw's defense; and (4) there might be a problem with cross-examination of the above-noted witnesses in the presentation of Urbanski's defense. In addition, the government's motion pointed out that it had made an offer to allow the defendants to plead guilty to the first count, dismiss the second count and make no recommendation as to sentencing. Its concern was that defense counsel might be reluctant to relate this offer to the defendants due to the fact that a defendant accepting the plea bargain would be required to cooperate and testify, and that such cooperation might result in the implication of the other defendant in the crime charged.

During its consideration of this motion, the trial court addressed both defendants. He asked each defendant whether or not he understood that he had a right to separate counsel. Both replied that they did. The court then proceeded to recite the possible areas of conflict noted in the government's motion. Finally, the court concluded:

"The measures that I am going to take is to advise you that each of you are entitled to be represented by separate counsel because you may have conflicting defenses in this case.

"Do you understand that, each of you? Mr. Urbanski?

"MR. URBANSKI: Yes.

"THE COURT: Mr. Bradshaw, do you understand that?

"MR. BRADSHAW: Yes."

For the record the court stated that he had heard the government's motion for inquiry with respect to joint representation and that both defendants continued to "persist" in their desire to be jointly represented by Attorney McDonnell.

After examining the preceding three inquiries, we can only conclude that Bradshaw accepted joint representation with his eyes open. It is apparent to this court that the magistrate and trial court carefully and meticulously advised Bradshaw in simple, understandable terms both of his right to separate counsel and of the perils of joint representation. On each occasion, the defendant, William Bradshaw, chose to accept those perils voluntarily, intelligently and knowingly by insisting that he be represented by Attorney McDonnell. As our court stated in *United States v. Gaines,* 529 F.2d 1038 (1976):

"When an actual conflict appears, the court must bring the fact of its existence and the resulting dangers which are reasonably foreseeable to the attention of each affected defendant so he can make an informed judgment at that time as to whether he wishes new counsel or wishes to continue with present counsel. Having done that, the court has fulfilled its duty and, if, despite the conflict and the attendant dangers, the defendant elects to continue with the same counsel, he thereby waives his sixth amendment right."

*Id.* at 1044 (footnote omitted). Here no actual conflict appeared, yet the magistrate and the trial court advised Bradshaw of his right to separate conflict-free counsel on three separate occasions. In addition, on each occasion Bradshaw was cautioned concerning any potential conflicts which were foreseeable to the court along with the possible consequences of those conflicts. Therefore, Bradshaw's election to retain Attorney McDonnell in the fact of these potential dangers resulted in the waiver of his Sixth Amendment right to separate conflict-free counsel.[2]

Because of our finding of waiver, we need not reach the questions of whether the district court's inquiries met the requirements of Fed.R.Crim.P. 44(c) and whether an actual conflict existed requiring reversal under *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). We have decided, however, to review these contentions since neither the government nor the

---

**2.** *See also United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431 (7th Cir.1983) where waiver of the right to conflict-free counsel was found after an exchange between the defendant and the trial court much less extensive than that found in the present case.

defendant directly addressed the issue of waiver and have extensively briefed the preceding issues.

With regard to Fed.R.Crim.P. 44(c) Bradshaw contends that the district court's inquiry into the facts of the joint representation and the underlying possibility of conflict of interest was not sufficiently detailed. Further, he contends that the court should have required him to make a narrative response in order to insure that he had a reasonable understanding of the import of the court's warnings concerning joint representation.

Rule 44(c) provides as follows:

"(c) Joint Representation. Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect such defendant's right to counsel."

Bradshaw contends that the drafters of this subsection intended that a defendant be required to make a narrative response to the court's inquiries concerning joint representation, detailing his understanding of his rights, in order to insure that the defendant knows and comprehends the perils that are inherently involved in joint representation. He cites in support of his position the fact that the Advisory Committee Notes quote from a Fifth Circuit case, *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975), holding that a defendant should be required to make a narrative response to the court's inquiries to establish an adequate waiver of his right to conflict-free counsel.

"[T]he court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections."

Fed.R.Crim.P. 44 advisory committee note, 1979 amendment (*quoting Garcia,* 517 F.2d at 278).

The government, on the other hand, argues that the Advisory Committee intended to adopt a procedure very similar to that followed by the Second Circuit which only "requires that the trial judge conduct a careful inquiry, including a personal interrogation of the defendants, to satisfy himself that no conflict exists and that the parties had no valid objection to joint representation." *United States v. Mari,* 526 F.2d 117, 119 (2d Cir.1975), *cert. denied,* 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976).

Contrary to both the government's and Bradshaw's position, we do not believe that the Advisory Committee intended to adopt any particular circuit's procedure with regard to the type of inquiry or response required when interrogating a defendant on his understanding of the problems of joint representation. If that had been the case, the Advisory Committee would have so indicated. Instead they stated:

"Rule 44(c) does not specify what particular measures must be taken. It is appropriate to leave this within the court's discretion, for the measures which will best protect each defendant's right to counsel may well vary from case to case."

Fed.R.Crim.P. 44, advisory committee notes, 1979 amendment. Our examination of the inquiries made by Magistrate Jurco and the district court indicate to us that the requirements of Rule 44(c) were not only more than satisfied, but also that Bradshaw understood exactly what he was doing when he chose to be represented by the same attorney representing his co-defendant.

■ Even if the district court had failed to make any inquiry, such a failure would not mandate a reversal. As the Fifth Circuit stated in *United States v. Benavidez,* 664 F.2d 1255 (5th Cir.), *cert. denied,* 457 U.S. 1121, 1135, 102 S.Ct. 2936, 2963, 73 L.Ed.2d 1334, 1352 (1982).

> "But neither the inquiry nor the advice is itself the goal of the rule [44(c)]; that goal is preventing conflicts. If there is no actual conflict, then the rule's purpose will not be served by reversal of a conviction. The Advisory Committee could not have made this more clear: 'The failure in a particular case to conduct a rule 44(c) inquiry would not, standing alone, necessitate the reversal of a conviction of a jointly represented defendant.' 77 F.R.D. at 603."

*Benavidez,* 664 F.2d at 1258–59. Thus, a complete failure to comply with Rule 44(c) does not mandate a reversal if the defendant is unable to demonstrate an actual conflict. This brings us to the next step in our analysis.

■ According to the Supreme Court, multiple representation:

> "does not violate the Sixth Amendment unless it gives rise to a conflict of interest.
>
> \* \* \* \* \* \*
>
> "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."

*Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed. 333 (1980) (footnote omitted). The defendant need not show that prejudice resulted from the joint representation, but he must show that "his counsel actively represented conflicting interests . . . ." *Id.* at 350, 100 S.Ct. at 1719. Subsequently to *Cuyler,* the Seventh Circuit

decided the case of *Dently v. Lane,* 665 F.2d 113 (7th Cir.1981). In that case our court stated:

> "*Cuyler* raises three further questions for a court to consider: (1) Was there a joint representation of co-defendants? (2) Was there an actual conflict of interest between co-defendants? (3) Did the alleged conflict of interest affect the adequacy of legal representation afforded the defendant?"

*Id.* at 116.

Obviously there is no doubt that Urbanski and Bradshaw were jointly represented by Attorney McDonnell. The main question is whether an actual conflict of interest existed between the co-defendants.[3] After a careful examination of the record, we find no actual conflict affecting the performance of Bradshaw's counsel. The defendants' trial strategy in this case was calculated to establish, through similar testimony of both Urbanski and the defendant William Bradshaw, that, in actuality, Ed Bradshaw was the mastermind of the theft, and that neither Urbanski nor William Bradshaw knowingly participated in the theft. As Justice Frankfurter pointed out in his concurring opinion in *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), co-defendants may, in fact, benefit from the presentation of a united defense against a common attack. "Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." *Id.* at 92, 62 S.Ct. at 475. It should be noted that both defendants did take the stand, and both essentially told the same story.

Bradshaw cites to several instances which he argues indicates that an actual conflict of interest existed. None of these instances, in our judgment, establishes any conflict requiring reversal under the Sixth Amendment. Bradshaw argues that the evidence

---

3. It should be noted that Attorney McDonnell assured the court on two occasions that no conflict existed and if even the "slightest" conflict arose he would bring in separate counsel. No separate counsel was ever retained. Generally, the district court is entitled to rely on the assertions of counsel. *Holloway v. Arkansas,* 435 U.S. 475, 485–86, 98 S.Ct. 1173, 1179, 55 L.Ed.2d 426 (1978). *See also United States v. Cox,* 580 F.2d 317, 322 (8th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979).

suggested that Urbanski had a greater degree of culpability and that this difference in degree of culpability presented a conflict of interest because it caused Bradshaw's counsel to "minimize" certain testimony, and also forced him (trial counsel) to present "an implausible theory that would help Urbanski."

Bradshaw's argument is flawed at the outset, since we believe his initial premise that he was "less culpable" than his co-defendant Urbanski is incorrect. It cannot be denied that the evidence indicated that it was Urbanski who had the inside knowledge of Barber Transport's procedures necessary to allow him to break in and steal the Blue Arrow trailer. The evidence also demonstrated, however, that in fact a conspiracy did exist between William Bradshaw and Urbanski. For example, the evidence showed that the goods were transferred, from the Blue Arrow trailer to the truck used to transport the goods to Urbanski's home, in the vicinity of B & B Transport, Bradshaw's place of employment. Bradshaw himself admitted driving the truck which transported the materials from B & B to Urbanski's house. In addition, it was Bradshaw who paid three individuals $100.00 each for their help in transferring and unloading the stolen goods. The mere fact that the defendant Bradshaw was not at Barber Transport when the Blue Arrow trailer was taken (if in fact this actually was the case) does not make Bradshaw any less culpable if he participated in the conspiracy in other ways as the jury concluded.

> "A defendant need not personally perform every act constituting the crime charged. Every person who willfully participates in the commission of a crime may be found guilty."

Fed.Crim. Jury Inst. of the 7th Cir., No. 5.05 (1980). Thus, a crime committed by more than one party with each party doing his part makes all of the parties equally responsible and liable for the end result.

Assuming *arguendo* that there was a difference in the degree of culpability, Bradshaw asserts that this somehow affected his trial counsel's treatment of certain evidence given by Derrill Beakley. He argues that this proves that an actual conflict existed which affected his counsel's performance. According to Bradshaw, Mr. Beakley's testimony substantiates his own version of the facts because it implicated Ed Bradshaw as the person in charge. In addition Beakley's testimony indicated that he (defendant William Bradshaw) did not participate in the transfer of the automobile parts from the Blue Arrow trailer to the Ranger Cartage truck. Bradshaw claims that Beakley's testimony was "minimized" by Attorney McDonnell because it hurt Urbanski due to its contradiction of Urbanski's testimony that he was not at the scene during the transfer of the merchandise between the Blue Arrow trailer and the Ranger Cartage truck. Our examination of the record, however, convinces us that Attorney McDonnell did nothing more than conduct a normal and proper cross-examination of the witness. There is absolutely no indication that in so doing, he was attempting to help one particular defendant at the expense of the other, and thus, Bradshaw fails to establish an actual conflict.

Bradshaw also argues that the differing degrees of culpability caused his attorney to attempt an implausible theory in order to help Urbanski. Short of admitting guilt, we cannot ascertain any other plausible theory which the defendants could have raised. What they jointly attempted to establish was that neither defendant willingly and knowingly participated in the theft, but rather that both were duped into helping Ed Bradshaw abscond with the goods. Because of the substantial amount of evidence connecting them to the theft their only reasonable alternative was to argue that they did not know the goods were stolen. The choice of a common defense appears to have been merely a tactical decision which obviously was agreed to by Bradshaw or he would have requested a separate attorney, especially after the repeated and exhaustive explanations of the perils of joint representation given to him on three separate occasions by the magistrate and the court. Thus, the choice of trial strategy does not

demonstrate that an actual conflict of interest did in fact exist. It should be noted that Bradshaw asserts no theory (plausible or not) which was foreclosed as a result of joint representation. Without such an assertion, we cannot conclude that Bradshaw's attorney was somehow acting under an actual conflict of interest.[4]

█ Bradshaw next claims that an actual conflict was created by the government's plea offer requiring that an accepting defendant cooperate with the government. Such cooperation raised the possibility that the accepting defendant might ultimately implicate the non-accepting defendant. Bradshaw argues that since his acceptance of the plea offer might have seriously damaged Urbanski's defense, a result which Urbanski's counsel wanted to avoid, "the dual representation likely prevented defendant's counsel from advising the defendant whether he should accept the Government's offer." This argument is completely without merit and borders on frivolous. The court itself made the offer known to the defendants when discussing the government's motion concerning joint representation.

"THE COURT: The Government has made an offer to defense counsel to allow the defendants to plead guilty to Count I, dismiss Count II and make no recommendation of sentencing if the defendants cooperate in the Government's investigation.

"And, also, in that instance, the Government alleges that counsel may be constrained in relating this offer to the defendants.

"Has he related that offer to you?

"Mr. URBANSKI: Yes.

"Mr. McDONNELL: I certainly have.

"THE COURT: All right. I want to protect you as well, Mr. McDonnell.

"The Government has requested that I advise each of the defendants and counsel of the conflict which may arise during the course of the trial as a result of the Government's plea offer and, also, to take any appropriate measures to protect you.

"The measures that I am going to take is to advise you that each of you are entitled to be represented by separate counsel because you may have conflicting defenses in this case.

"Do you understand that, each of you? Mr. Urbanski?

"Mr. URBANSKI: Yes.

"THE COURT: Mr. Bradshaw, do you understand that?

"Mr. BRADSHAW: Yes."

It is hard to understand how any conflict could have occurred here unless Bradshaw's attorney actually did fail to transmit this plea offer to him. Bradshaw makes no such allegation, rather he merely states in his brief that "dual representation *likely* prevented" counsel from so advising Bradshaw. It is not surprising that Bradshaw fails to make an unequivocal allegation of failure to disclose in light of the above-quoted record wherein his counsel told the court he had related the offer and his co-defendant agreed. Both statements were made in Bradshaw's presence without his objection. Since there is no evidence to support this claim, we will not assume that defense counsel so failed to advise Bradshaw concerning the Government's plea offer.

█ Finally, Bradshaw argues that there was an actual conflict during his sentencing because counsel failed to argue his lesser culpability as compared to Urbanski since in order to do so, counsel would have had to argue for a greater sentence for Urbanski. As we have previously stated, we fail to understand how Bradshaw can claim that he was less culpable than Urbanski. Bradshaw himself noted that the district judge

---

4. Even if Bradshaw had been able to allege another plausible theory we would not be compelled to find an actual conflict. As the First Circuit pointed out in *United States v. Foster,* 469 F.2d 1, 4 (1st Cir.1972):

"Of course, Foster might have tried a very different line of defense under the guidance of separate counsel, but this is merely to say that one lawyer may try a case quite differently from another. The possibility here that another approach might have been used, with better results for the defendant, exists in every case and is very far indeed from making out a deprivation of constitutional right."

believed that the defendants were " 'equally involved' in the crime, and that while '[p]erhaps one may have been the leader, ... they both share an equal amount of guilt.' " We agree. Such an argument by defense counsel at the sentencing hearing would have been contrary to the facts. Thus, Attorney McDonnell's failure to assert this argument on Bradshaw's behalf does not establish an actual conflict.[5]

The preceding analysis indicates: (1) that the defendant Bradshaw clearly waived his right to separate, conflict-free counsel; (2) that the trial court complied with the requirement of Fed.R.Crim.P. 44(c); and (3) that no actual conflict existed. As the Supreme Court held in *Cuyler,* a mere possibility of conflict does not warrant reversal. 446 U.S. at 348, 100 S.Ct. at 1718.

In addition to his argument that his counsel was operating under a conflict of interest, the defendant argues that he was afforded ineffective assistance of counsel in violation of his Sixth Amendment right to counsel. This argument is likewise without merit. Our court has recently reaffirmed the standard originally set forth in *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975), that the Sixth Amendment "guarantees a criminal defendant legal assistance which meets a minimum standard of professional representation." *See United States v. Kalita,* 712 F.2d 1122, 1129 (7th Cir.1983) (*quoting Twomey,* 510 F.2d at 641). To determine whether the *Twomey* standard is met, a "court must look at the totality of circumstances in the particular case." *United States v. Phillips,* 640 F.2d 87, 92 (7th Cir.),

*cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981) (footnote omitted). In *Guzzardo v. Bengston,* 643 F.2d 1300 (7th Cir.), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981) this court defined the *Twomey* standard as follows:

> "A minimum standard of professional representation does not mean representation free of questionable tactical decisions or even what hindsight might suggest were mistakes. It means representation without serious prejudicial blunders which have foreseeable adverse consequences. Implicit in the Sixth Amendment right to counsel in criminal cases is the notion of adequacy."

*Id.* at 1305. Upon examination of the record we find that Bradshaw's legal assistance not only met but in fact exceeded this minimum standard of the profession. Note that most of Bradshaw's arguments concerning ineffective assistance of counsel concern his contention that his attorney operated under a conflict of interest which we have held the record fails to establish.

Turning to the defendant's next claim of error, Bradshaw argues that his conviction must be reversed because one of the government's witness's improperly inferred, through the admission of hearsay, that others had implicated the defendant in the alleged theft. The asserted error occurred in the following dialogue between the government's attorney and one of its witnesses.

> "Q. Agent Appleby, how many wooden pallets were contained on that shipment that was transported by the Blue Arrow trailer?
>
> "A. 28.

---

5. Bradshaw also asserts that the following instances demonstrate an actual conflict: (1) counsel's boilerplate opening statement simply telling jurors to keep an open mind; (2) failure to file pretrial motions such as a motion for severance; (3) brief cross-examinations of certain witnesses; (4) failure to tender accomplice instructions regarding testimony of Beakley and Radke; (5) general failure to pursue the case; and (6) failure in closing argument to highlight the lack of evidence that existed against Bradshaw. With regard to the first four claims, Bradshaw completely fails to indi-

cate how they establish the existence of an actual conflict. As to claim number five, our subsequent discussion of ineffective assistance of counsel demonstrates our disagreement with this statement. Finally, with regard to the sixth claim, we believe there was substantial evidence linking Bradshaw to the crime, *see* discussion *infra,* and thus such an argument would have been contrary to the facts. Therefore, none of these additional claims establishes an actual conflict of interest which affected his counsel's performance.

"Q. 28 wooden pallets?

"A. Yes, sir.

"Q. And during your investigation did there come an occasion for you to find certain pallets?

"A. Yes we did. When we received information that an individual by the name of William Bradshaw might possibly be—

"MR. McDONNELL: Objection to this, Judge. This is highly improper. It is pure hearsay that he is repeating."

The court sustained the objection. Bradshaw, however, contends that "the witness had already succeeded in getting before the jury the improper implication that other people had linked the defendant to the theft." He asserts the following two-prong argument to justify his position: (1) the evidence was hearsay, and under *United States v. Barash*, 365 F.2d 395 (2d Cir.1966), *after remand*, 412 F.2d 26 (2d Cir.), *cert. denied*, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969) reversal is required; and (2) as "background" evidence of the government's investigation, its prejudicial effect outweighed any incidental benefit and therefore should have been excluded under Fed. R.Evid. 403.

*Barash* involved a defendant, who was both an attorney and a certified public accountant, charged with making payoffs to various Internal Revenue agents in return for favorable audits. One of the government's witnesses (an IRS agent) admitted on cross-examination that the money he received from the defendant had been paid only after the particular audit involving the agent was completed. Cross-examination of this witness emphasized that the payment could not have been intended to influence the agent's actions in any way since it was made at the end of the audit, and not before. On redirect, the government attempted to rehabilitate its witness by eliciting testimony that another IRS agent, Jeanne Lupescu, "had never introduced me to anyone except someone who was going to pay me off." 365 F.2d at 399. The Second Circuit held that this latter testimony should not have been admitted.

"Its hearsay nature, which would have been obvious if Coady [the witness] had said Lupescu had told him that Barash had previously paid her or other agents and thus was an accountant of the paying kind, was not removed because she conveyed her meaning without the use of words."

*Id.*

The defendant argues that the present fact situation is indistinguishable. He claims that the witness's answer in the present case—"When we received information that an individual by the name of William Bradshaw might possibly be"— could only be completed by the jury as follows: "When we received information that an individual by the name of William Bradshaw might possibly be [*involved in the theft*]." Thus, according to Bradshaw, damaging hearsay was erroneously admitted, just as in *Barash*, only here its admission was "by implication" because the witness's statement was incomplete. Bradshaw argues that the admission of this hearsay statement, with its damaging inference, requires reversal.

We disagree. Contrary to the situation in *Barash*, in this case a timely objection was interposed by Attorney McDonnell which, in turn, was sustained by the district court. This left the witness's statement unfinished. Notwithstanding the defendant's arguments, innocent inferences can be drawn from the incomplete statement, i.e., the statement does not necessarily imply that others had linked Bradshaw to the theft. For example, the statement could have been completed as follows: "When we received information that an individual by the name of William Bradshaw might possibly be [*in possession of information concerning the missing pallets*]."

Furthermore, if Bradshaw's counsel actually felt that even this incomplete answer was highly prejudicial, he could have requested that the answer be struck and the jury instructed to disregard the same. This, however, he failed to do. We disagree with the defendant's assertion that such a limiting instruction would have been inef-

fective. Since the statement itself was incomplete, any prejudicial effect could have been eliminated by a cautionary instruction. We are not willing to assume, as the defendant urges us to do, that the jury was so swayed by this single incomplete statement that a limiting instruction would have been of no avail. It appears to us that the defendant's attorney merely made a tactical decision in declining to ask that this statement be struck and a limiting instruction be given. Such a tactical decision should not increase the defendant's chances of obtaining a reversal. Thus, the defendant's attorney's failure to request that the statement be struck and a limiting instruction be given, along with our position that *Barash* is distinguishable, leads us to conclude that admission of the incomplete statement is not reversible error under the first-prong of Bradshaw's argument.

For the second-prong of his argument the defendant relies on *United States v. Mancillas,* 580 F.2d 1301 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). In that case a DEA agent was permitted to testify, over the defendant's objections, that he had "received a tip from Rodriquez [an informant] that Mancillas [the defendant] was then in Cleveland, would by [sic] flying to El Paso, would return to Chicago for eight to ten hours, and would then go to a motel in Joliet "to receive a shipment of heroin.'" 580 F.2d at 1309. The court initially determined that this evidence was not hearsay because it was not intended to prove the truth of the matter asserted but rather was introduced only to provide background information to explain the extensive investigatory activity surrounding the case. The court concluded, however, that the above-quoted statement should have been excluded under Fed.R. Evid. 403 as the out-of-court charge made by an informant to the DEA agent asserting that the defendant would engage in criminal activity was so prejudicial that it outweighed any benefit obtained by its admission. *Id.* at 1310.

The defendant fails to point out, however, that the *Mancillas* court ultimate-

ly held, notwithstanding the fact that the evidence should have been excluded, that reversal was not required. To reach that decision the court undertook an analysis of "whether the danger that the jury would take the hearsay statement of Rodriquez as proof that a heroin deal was the purpose of the Joliet trip, had any reasonable likelihood of affecting the verdict ...." *Id.* at 1310 (*citing Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). As in *Mancillas,* we think that under the circumstances, no reasonable likelihood exists that the admission of the incomplete statement of the government's witness affected the verdict. Even if inadmissible, the statement was immediately corroborated by that same government witness. He testified that the twenty-eight pallets traced to the stolen shipment were found adjacent to the B & B premises—Bradshaw's employer. Although circumstantial, this fact, considered in conjunction with the other evidence adduced at trial, certainly implicated Bradshaw in the theft charged. Furthermore, in the present case, unlike *Mancillas,* the statement at issue here was incomplete and subject to innocent interpretation. Thus, under Fed.R.Evid. 403 (the basis of the *Mancillas* decision) it is obvious that the admission of this incomplete and innocuous statement was not prejudicial to such a degree that it outweighed its probative value. This in and of itself distinguishes the case at bar from *Mancillas.* Finally, as we previously stated, if defense counsel had felt that the statement, even in its incomplete form, was highly prejudicial, he could have moved that it be struck and the jury instructed to disregard. We will not now hold that under Rule 403 the statement should have been excluded when because of a tactical decision the problem was not resolved at trial. Therefore, the second-prong of Bradshaw's argument also fails since neither Fed.R.Evid. 403 nor *Mancillas* require reversal.

We now turn to Bradshaw's last contention of error—that there was insufficient evidence to support the verdict. This argument is likewise without merit. The de-

fendant essentially argues that the government has failed to show that he *knowingly participated* in the theft. At the outset of his argument, he correctly cites *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), for the proposition that "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *See also United States v. Brown*, 716 F.2d 457 (7th Cir.1983). He then proceeds, however, to view the evidence most favorable to himself, rather than the government.

■ Contrary to the defendant's contention, when the evidence is viewed in the light most favorable to the government it becomes apparent that the jury's verdict finds substantial support in the record. It is uncontested that the Blue Arrow trailer was stolen from Barber Transport and that the load was transferred in the vicinity of B & B, Bradshaw's place of employment. Bradshaw's car was observed accompanying the Blue Arrow trailer as it left the Barber Transport lot. In addition, several witnesses testified that they observed the Blue Arrow trailer at or near the B & B premises. One witness also testified that he saw Bradshaw back up a Ranger Cartage truck to the Blue Arrow trailer. The evidence showed Bradshaw had access to the keys of Ranger Cartage trucks because of his employment at B & B. The 28 specially made pallets, traced to the A/C shipment, were found immediately adjacent to B & B.

The record also reveals that it was Bradshaw who enlisted the help of Derrill Beakley to transfer the auto parts from the Blue Arrow trailer to the Ranger Cartage truck. According to Beakley, Bradshaw asked him, "why don't you come on down to the garage where my car [is] at . . . I have got some work to do." The auto parts were transferred to the Ranger Cartage truck and Bradshaw, by his own admission, drove that truck to Urbanski's home. The parts were then placed in Urbanski's garage. Bradshaw paid $100.00 each to three of the people who helped transfer and unload the stolen goods. Thus, there was substantial circumstantial evidence which implicated Bradshaw in the theft of the auto parts. As this court stated in *United States v. Cogwell*, 486 F.2d 823, 828 (7th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974), "[c]ircumstantial evidence is as pertinent as direct evidence to the establishment of guilt or innocence." *Id.* at 828.[6]

Edward Bradshaw, corroborated the government's story. He testified that he had a conversation with his cousin, the defendant Bradshaw near the Ranger Cartage truck. At the time of that conversation he testified that the Blue Arrow trailer was back-to-back with the Ranger Cartage truck. He further testified that he observed the defendant Urbanski inside the Blue Arrow trailer. Finally, he testified that about a week after July 4th he had a conversation with the defendant Bradshaw at which time the defendant told him that the "stuff" had been stolen. According to Edward Bradshaw, the defendant also wanted to know if the police had come around and what he was going to say if they did.

Thus, we hold that the record reveals more than substantial evidence to support the jury's verdict of guilt. Bradshaw argues, however, that the case came down to Edward Bradshaw's version of the facts versus his own. Even if this were true, it is not our place to question the credibility judgments of the jury. *See Glasser*, 315 U.S. at 80, 62 S.Ct. at 469. As our court stated in *United States v. Xheka*, 704 F.2d 974, 988 (7th Cir.1983), "[i]t is the role of the jury, and not of this court, to pass on the credibility of a witness."

*Finding no merit in the defendant's arguments, we affirm the convictions.*

---

**6.** *See also United States v. Redwine*, 715 F.2d 315 (7th Cir.1983); and *United States v. Cox*, 580 F.2d 317, 323 (8th Cir.1978), *cert. denied*, 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979) where the court stated, "the essential elements of the charge may be proved by circumstantial evidence as well as direct evidence since circumstantial evidence is intrinsically as probative as direct evidence."