**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Serafin CASTILLO, Defendant–
Appellant.**

**No. 91–1288.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1992.

Decided May 29, 1992.

Brian P. Netols (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Frederick F. Cohn, Chicago, Ill. (argued), for defendant-appellant.

Before CUMMINGS, POSNER, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

Serafin Castillo was convicted by a jury of conspiracy to commit extortion, in violation of 18 U.S.C. § 1951, and sentenced to four months in prison. Three months after being convicted, but before being sentenced, Castillo through a newly retained lawyer moved for a new trial, contending that his trial lawyer had failed to represent him effectively. The judge denied the motion as untimely. Castillo appeals both from the judgment of conviction, on the ground of ineffective assistance of counsel, and from the denial of the motion for a new trial, on the ground that such a motion even when untimely may be granted if the basis for the motion is ineffective assistance.

Castillo was punished for his participation in a case of journalistic blackmail. Gilberto Lopez Grenados, who was tried together with Castillo and convicted but who fled before being sentenced and remains a fugitive, published a Spanish-language newspaper in Chicago called *Tribuna de America*. One of his competitors was Socorro Grajeda, the publisher of *El Pueblo* (for which Grenados had once worked). Grajeda also was president of MEDA (Mexicanos de Afuera—expatriate Mexicans), a service organization of the Mexican–American community of Chicago. Grenados published a series of articles in *Tribuna* that were (to say the least) highly critical of Grajeda. They charged that MEDA was defrauding the community, that the food it distributed to the poor was "waste from warehouses," and that Grajeda had low morals and by participating in MEDA was "behaving like a vulgar market woman." Disturbed and embarrassed, Grajeda would whenever she encountered Grenados plead with him to stop publishing the articles. He said he wouldn't stop until he had destroyed both her and MEDA.

After this had gone on for some time Grenados telephoned Grajeda and told her that if she paid him, he would stop publishing the articles critical of her. She said that she couldn't afford to pay him. Enter Castillo, an acquaintance of both Grenados and Grajeda, who owned a grocery store in the same neighborhood where *Tribuna* and *El Pueblo* were published. Shortly after the telephone conversation, Castillo began visiting and phoning Grajeda. Though always polite and cordial, he kept asking her where the money was that Grenados wanted and he told her, though Grenados had never named a sum to her, that Grenados wanted $26,000. He warned her that if she didn't pay, Grenados wouldn't stop the stream of articles criticizing her; at the

same time he reassured her that if she did pay, Grenados would stop—indeed, he, Castillo, would see that he stopped.

Grajeda confided in a business associate, who called the FBI, who recorded the next phone call by Castillo to Grajeda. In it he told her that Grenados wanted to meet her the next day to arrange about the payment of the $26,000. She asked him to put Grenados on the phone. Castillo demurred, but shortly afterward showed up in person at Grajeda's office and told her that Grenados would talk to her but that she would have to call him from a pay phone because Grenados feared she might be planning to record the call. Accompanied by Castillo and by an undercover FBI agent who was posing as a friend of hers, Grajeda crossed the street to a pay phone. Castillo dialed a number and handed the phone to Grajeda. Grenados was on the other end. Grajeda told him that she would pay, but she wanted a written promise that if she paid the articles would stop. Grenados replied that she would have to arrange it with Castillo. Afterwards Grajeda asked Castillo why he had gotten involved in the matter and he said that he wanted to see the articles stopped and that he might be compensated by Grenados if things worked out; Grenados owed him $5,000. Castillo then invited her to a meeting the next day with Grenados at the grocery store that Castillo owned.

The meeting came off as scheduled. Grajeda in the presence of the two men handed Grenados a bag of (marked) money. At first he wouldn't take it and told her to hand it to Castillo, but she urged him to take it and eventually he did. Grenados refused to furnish a written promise to stop publishing the articles but he did give her a receipt for the money. The two men were then arrested.

Grenados and Castillo had the same lawyer at trial, and this is the basis of Castillo's first ground of appeal. Before trial the prosecutor asked the judge to conduct, pursuant to Fed.R.Crim.P. 44(c), an inquiry to determine whether joint representation might create a conflict of interest. In response, the lawyer for the two defendants submitted a statement, signed by both, saying that they wanted to be represented by this lawyer and that he had discussed with them in detail the potential conflict of interest posed by the arrangement. The district judge held a brief inquest at which the prosecutor moved to disqualify the lawyer from representing more than one of the defendants and the defendants' lawyer repeated that he had discussed the potential conflict of interest with his clients and had concluded that there was none. There was none because the defense that they had decided to present was that the negotiations culminating in the cash payment constituted a legitimate rather than an extortionate business transaction: the $26,000 was to buy Grenados's newspaper, Grajeda having decided that that was the only way she could stop the flow of defamatory articles about her.

After receiving some further submissions from the prosecutor and the defense lawyer and engaging in some give and take with them, the judge turned to the defendants and asked them seven questions. The first was, "Did you hear what Mr. Aronson [the defense lawyer] just said?" The last was, "You both want Mr. Aronson to represent you?" The defendants answered "Yes" to all the questions, without elaboration, whereupon the judge denied the prosecutor's motion to disqualify Aronson from representing both.

No issue was raised at that time concerning the defendants' competence in the English language, but it was raised later and the judge decided to assign an interpreter to Castillo for the trial. At the trial, the government presented the evidence that we summarized above. The defense put on only a single witness—a character witness.

If the best defense had indeed been to depict the negotiations as a legitimate business transaction, then joint representation would have been a defensible tactical choice, as otherwise each defendant might be placed in the position of arguing both that the transaction was legitimate and that it was the other defendant who was to blame—a form of alternative pleading that might not impress a jury. If on the other

hand mutual finger-pointing was the best defense—Grenados arguing that it was not he but Castillo who had handled the negotiations and Castillo arguing that he was just an errand boy for Grenados and didn't know the transaction was not on the up and up—then separate representation was indicated.

■ As the evidence unfolded at trial, it became clear that the first line of defense was hopeless. The "transaction" was not the sale of a business. It was blackmail, a standard form of extortion. *United States v. Nardello*, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). Grenados told Grajeda that for a price he would stop publishing discreditable things about her. He thus was selling silence. Whether the discreditable things were true or false is irrelevant. Granted, blackmail with false information is less likely to succeed than if the information were true, because the victim has a potential remedy by way of defamation (as he would not, of course, if the information were true), and is therefore less likely to pay. He may also fear that by paying he will be making the false information more credible and thus harder to disprove later—or even be inviting the blackmailer to return with a new demand, since the more credible the dirt the higher the price for burying it. Still, there are occasional cases of blackmail with false dirt—enough of them that we know that this form of blackmail is just as criminal as the more common kind. *United States v. Schwartz*, 398 F.2d 464, 466 (7th Cir.1968); *People v. Camodeca*, 52 Cal.2d 142, 338 P.2d 903 (1959); *State v. McNellis*, 25 Conn.Supp. 5, 195 A.2d 572 (Super.Ct.1963) (per curiam); *Roberts v. United States*, 248 Fed. 873, 877 (9th Cir.1918). Had Grajeda taken the initiative in seeking to exchange money for forbearance to publish, this would not be a blackmail case. It is a grave violation of journalistic ethics, but it is not blackmail (or extortion), passively to accept an offer of payment in exchange for silence. *United States v. Holzer*, 816 F.2d 304, 310–11 (7th Cir.), remanded for reconsideration on other grounds, 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987), on remand, 840 F.2d 1343, 1351 (7th Cir.1988);

James Lindgren, "Blackmail: On Waste, Morals, and Ronald Coase," 36 *UCLA L.Rev.* 597, 606 and n. 34 (1989). But it was Grenados who took the initiative.

■ We have undertaken this little excursus into the law of blackmail to make clear that the line of defense which the defendants' trial counsel proposed was indeed a nonstarter. Maybe it seemed to have some potential before the government's witnesses testified, though that seems unlikely; in any event it was a flop at trial. With the benefit of hindsight, therefore, we can see that the defendants had nothing to gain from joint representation and something to gain from separate representation and mutual finger-pointing. Castillo in particular would have had a shot at persuading the jury that he had been just an innocent errand boy, trying in good faith to broker a dispute between two of his friends and unknowing of the scheme of blackmail that lay behind it. The light sentence that he received is some evidence that the judge thought him an almost innocent errand boy. Maybe with separate representation Castillo could have mounted the next step and won acquittal. Alternatively, a lawyer working just for him might have brokered a plea agreement by which in exchange for a lighter sentence Castillo would have agreed to testify against Grenados.

■ But all this is by way of hindsight. If the defendants made an effective waiver of their right to separate representation, the fact that ex post their decision turned out to be mistaken would no more entitle them to a new trial than a parallel disappointment in an ordinary contract case would entitle the disappointed party to rescind the contract. *United States v. Roth*, 860 F.2d 1382, 1388–89 (7th Cir.1988); *United States v. Krebs*, 788 F.2d 1166, 1173 (6th Cir.1986). "Waiver" in law *means* that you give up something of potential value to you. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). So we must consider whether there was an effective waiver. On the record before us, the answer is yes.

The lawyer had a strategy, ill-conceived as it may in retrospect appear to have been, that if followed would have eliminated any conflict of interest that joint representation might otherwise have presented. The lawyer represented to the court without contradiction that he had explained the strategy to the defendants, that he had also explained to them the risk of joint representation, and that they had decided they wanted him to represent them both. The government objected, but that could not be decisive; the government is not allowed to prescribe defense strategy or to thwart joint representation when it might be in the interests of the defendants. *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), holds that the judge can, not that he must, disregard a defendant's waiver of his right to be represented by a lawyer who does not have a conflict of interest.

Admittedly the series of questions that the judge put to the defendants in an effort to verify that the lawyer had accurately represented their discussions fell far short of a probing inquest. And because consistency required the defendants only to say "yes" to each question, there was a danger that they were reciting mechanically without actually understanding the questions. It would have been better if the judge had injected at least one "no" question, such as whether the defendants would prefer to have separate lawyers; if they had said "yes" he would have known something was wrong. It might have been better still if instead of inviting monosyllabic responses he had tried to elicit a narrative response, as in *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir.1975), though we have held that this procedure is not mandatory. *United States v. Bradshaw*, 719 F.2d 907, 914 (7th Cir.1983). To insist on it in every case would be to confuse a knowing waiver with an articulate one. A defendant may have a strong and informed preference for joint representation yet, lacking training in law or experience in public speaking, be unable to articulate the grounds for it intelligibly.

We are given some pause by our uncertainty as to how well the defendants could understand English. Yet when it later developed that Castillo had a language problem, the government did not renew its motion for disqualification. And he may have had enough English to understand the judge's questions (we don't know whether Aronson spoke to his clients in English or Spanish) without having enough to be comfortable listening to a complete trial conducted in English.

We cannot without more pronounce Castillo's waiver unknowing, but of course a fuller record might have disclosed a more compelling case than it was. A hearing at which Castillo and Aronson testified might reveal that not only the judge but also the lawyer had spoken to Castillo only in English, that Castillo's English really was too poor for him to have understood either one, or even that Aronson had never explained the pros and cons of joint representation either generally or in the context of this case. A hearing might show that Aronson had been incompetent in advising his clients to follow a strategy, that of depicting the "transaction" as legitimate, that eliminated the conflict of interest otherwise latent in joint representation of defendants of unequal guilt.

It was in recognition of the need to make a record in order to present a convincing case of unknowing waiver that Castillo's new lawyer moved for a new trial and requested an evidentiary hearing on the motion. But there is no way around the command of Rule 33 of the Federal Rules of Criminal Procedure that a motion for a new trial be made within seven days of the guilty verdict unless based on newly discovered evidence. The motion was based not on any newly discovered evidence, but on what is not an adequate substitute—hope that an evidentiary hearing might develop some new evidence. *United States v. Mazzanti*, 925 F.2d 1026, 1031 (7th Cir. 1991); *United States v. Salerno*, 868 F.2d 524, 541 (2d Cir.1989); *United States v. Pinkney*, 543 F.2d 908, 916 (D.C.Cir.1976). It is not as if the defendants had discovered after trial that Aronson had actually been a paid agent of the prosecutor. That would be newly discovered evidence materi-

al to the effectiveness of their waiver of the right to separate representation. Cf. *United States v. Espinosa–Hernandez*, 918 F.2d 911 (11th Cir.1990) (per curiam); *United States v. Kelly*, 790 F.2d 130, 138 (D.C.Cir.1986). Nor do we mean to suggest that the motion itself must establish the movant's entitlement to judgment. The evidence tendered with the motion need only establish "a high enough probability of error to warrant a hearing." *Amax Coal Co. v. Franklin*, 957 F.2d 355, 357 (7th Cir.1992). No evidence was presented, however.

■ Castillo's lawyer argues that the only alternative to the (untimely) motion for a new trial was to wait and file a postconviction motion under 28 U.S.C. § 2255, which can be done only after the defendant has exhausted his appellate remedies; and he should not have to wait that long to raise the issue of ineffective assistance of counsel. Well, he didn't wait that long. He has argued that we should reverse his conviction on the basis of the unsupplemented trial record, and we have rejected the argument on the merits. *United States v. Taglia*, 922 F.2d 413, 417–19 (7th Cir.1991). Normally of course an issue that was not and could not have been raised at trial cannot be raised on appeal, although if it is a criminal case it can be raised in a postconviction proceeding. And that is the character of a complaint about trial counsel's performance—*he* isn't going to raise it at trial; he didn't here, of course. However, courts have made an exception to the rule that an issue not raised at trial can't be raised on appeal. They allow an appellant to argue the ineffectiveness of his trial counsel provided that he is willing to base his argument on the trial record—for obviously the appellate court isn't going to compile a further record. For illustrative decisions (besides *Taglia* ) see *United States v. Pinkney, supra*, 543 F.2d at 915; *United States v. Hallock*, 941 F.2d 36, 43 (1st Cir.1991); *United States v. Matos*, 905 F.2d 30, 32 (2d Cir.1990); *United States v. Tatum*, 943 F.2d 370, 380 (4th Cir.1991); *United States v. Bounds*, 943 F.2d 541, 544 (5th Cir.1991); *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir.1990) (per curiam);

*United States v. Kindle*, 925 F.2d 272, 276 (8th Cir.1991); *United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir.1991); *Beaulieu v. United States*, 930 F.2d 805, 806–07 (10th Cir.1991). The Eleventh and possibly the Third Circuit used to think the better practice was to postpone all such challenges to the postconviction stage by refusing to waive the normal rule against raising new issues for the first time on appeal. *United States v. Khoury*, 901 F.2d 948, 969 (11th Cir.1990); *United States v. Arango*, 853 F.2d 818, 823 (11th Cir.1988); *United States v. Sandini*, 888 F.2d 300, 312 (3d Cir.1989). But they have receded from this position and joined the majority. *United States v. Hamblin*, 911 F.2d 551, 556 (11th Cir.1990); *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir.1991). Rejoined, in the case of the Third Circuit. See *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 133 (3d Cir.1984). There is no longer a conflict between circuits on the issue.

This case is not within the exception, however. The trial record—all an appellant can go on who didn't raise the conflict of interest point in the district court by filing a motion for a new trial—discloses merely a *potential* conflict of interest, and if the defendants waived any objection to it knowingly and intelligently there was no denial of their right to effective representation. So far as appears from the trial record the waiver *was* knowing and intelligent. To prevail therefore Castillo must present more evidence. He could not do that by means of an untimely motion for a new trial. He could have done it by filing a timely motion for a new trial, as suggested in *Taglia*, or initiating a postconviction proceeding after he exhausted his appellate remedies. It is premature to decide whether by raising the issue now he has waived his right to raise it in a postconviction proceeding.

■ The only other challenge to the judgment of the district court is that the prosecutor commented on Castillo's failure to take the stand, thus penalizing Castillo's right not to be forced to incriminate himself. (The penalty, if that is what it should be called, was slight, because juries are

perfectly capable of drawing an adverse inference from a defendant's refusal to testify on their own without having to be asked to do so. *United States v. Garguilo*, 310 F.2d 249, 252 (2d Cir.1962) (Friendly, J.).) There was no direct such comment. All the prosecutor said was that no evidence had been presented that supported the defendants' defense, which as we know is that the transaction between them and Grajeda was a legitimate business transaction rather than blackmail. This is a proper comment. *United States v. Martinez*, 937 F.2d 299, 310–11 (7th Cir.1991). It is not equivalent to telling the jury that the defendants must be guilty because an innocent person would have testified. It might be equivalent if the only way a defendant could present evidence was by testifying. But defendants are not the only potential defense witnesses. Indeed, criminal defendants often rely on the government's witnesses to establish the essential elements of the defense. All the prosecutor was saying was that, with the trial complete, there was no evidence to support the defense lawyer's argument that his clients had been engaged in a legitimate transaction. He was commenting on the balance of the evidence, not about the exercise by the defendants of their constitutional rights.

██ The cases say, it is true, that if it is highly unlikely that anyone other than the defendant could rebut the prosecutor's case, a comment on the absence of evidence in support of the *defense* case will be understood by the jury as a comment on the *defendant's* failure to take the stand and is therefore forbidden. *Freeman v. Lane*, 962 F.2d 1252, 1259–60 (7th Cir.1992); *United States v. DiCaro*, 852 F.2d 259, 263 (7th Cir.1988); *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1300–01 (7th Cir. 1985); *United States v. Buege*, 578 F.2d 187 (7th Cir.1978); *United States v. Fearns*, 501 F.2d 486, 490 (7th Cir.1974); *United States v. Norton*, 867 F.2d 1354, 1364 (11th Cir.1989); *United States v. Guzman*, 781 F.2d 428, 432 (5th Cir.1986) (per curiam). This might appear to be such a case; only the defendants could have contradicted Grajeda's version of the transaction which they contend was a legitimate

business deal. But we understand the cases to require more than just a logical connection between the prosecutor's comments and the defendant's failure to take the stand. For then in every case in which the only possible defense witness was the defendant himself and he had failed to take the stand, the prosecutor would be prevented from pointing out to the jury that the evidence one-sidedly favored the prosecution. So there must be some basis for an inference that the prosecutor's remarks were in fact (or would be understood as) directed at the defendant's failure to take the stand, viewed as evidence of guilt. Hence our reference in *Freeman v. Lane*, *supra*, at 1261, to the prosecutor's "strong, repeated references" as constituting "studied rhetoric" and "pointed comment" on the defendant's failure to testify, and in *United States ex rel. Burke v. Greer*, *supra*, 756 F.2d at 1300 (quoting *United States v. Lyon*, 397 F.2d 505, 509 (7th Cir.1968)), to remarks that a jury would "naturally and necessarily take to be a comment on the defendant's failure to testify." There is nothing of that sort here.

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I concur in the judgment of the court.