**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Stuart Steven NOBLE,**
**Defendant-Appellant.**

No. 83–1997.

United States Court of Appeals,
Seventh Circuit.

Argued May 30, 1984.

Decided Jan. 29, 1985.

As Amended Feb. 11, 1985.

Rehearing and Rehearing In Banc
Denied Feb. 22, 1985.

Carl M. Walsh, Chicago, Ill., for defendant-appellant.

Canella E. Henrichs, Dan K. Webb, U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Before BAUER and COFFEY, Circuit Judges, and CAMPBELL, Senior District Judge.*

COFFEY, Circuit Judge.

The defendant, Stuart Noble, was convicted of conspiracy to distribute counterfeit Federal Reserve Notes in violation of 18 U.S.C. § 371, distribution of counterfeit money in violation of 18 U.S.C. § 473, and aiding and abetting such distribution in violation of 18 U.S.C. § 2. The defendant now raises numerous grounds for reversal on appeal, including his assertion that two conspiracies were demonstrated at trial rather than the single conspiracy charged in the indictment, and thus he was prejudiced by the admission of evidence concerning the second conspiracy. He also asserts that the use of his prior counterfeiting conviction to impeach his credibility unduly prejudiced the jury. Finally, Noble argues, through newly substituted counsel for this appeal,[1] that he was ineffectively represented at trial and that his original counsel had a conflict of interest which prejudiced his case. The defendant was sentenced to two consecutive six-year terms followed by five years of probation. We affirm.

I.

The evidence discloses that in early 1980, the defendant Noble contacted a Bennett Handelman, a social and business acquaintance[2] and asked Handelman if he would participate in a scheme to manufacture and distribute counterfeit Federal Reserve Notes. Handelman agreed with Noble to act as a partner in the counterfeiting scheme and during the months that followed the two planned the counterfeit operations including frequent telephone communications.

Subsequently, in late 1980 Noble purchased a printing business in Los Angeles, California known as Argold Press. The evidence discloses that during this period of time the defendant was a close acquaintance of one Jack Catain, the owner of Fox Brothers Leasing, an automobile leasing business. At trial, an employee of Argold Press testified that she had observed Catain visiting Argold Press weekly and then later on a monthly basis after it had opened for business. In the late spring of 1981, Noble telephoned Handelman requesting a loan to buy the equipment needed to print the counterfeit money; Handelman complied and advanced approximately $5,500 to Noble. Records of wire transfers of mon-

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Prior to the oral argument the defendant's motion for substitution of counsel was granted on May 24, 1984, with additional time granted for further briefing.

2. Handelman later agreed to testify for the government.

ey from Handelman to Noble corroborated this testimony. Handelman recalled at trial that in late May of 1981 Noble again called and told him that he had obtained the necessary equipment and that one of his employees, a Jon Luce, had agreed to help in the manufacture of the counterfeit money. The government also introduced records of numerous phone calls during this time between Argold Press and the Fox Brothers, the business owned by Jack Catain.

In June of 1981, Handelman testified that he traveled to Argold Press in California and remained in southern California for approximately four weeks, frequently staying after working hours with Noble and Luce. It was at this time that Noble repaid Handelman the $5,500 loan. In August of 1981, Noble flew to Chicago and made an initial delivery of $250,000 in counterfeit notes to Bennett Handelman at his residence in Skokie, Illinois. Handelman distributed this counterfeit money to his contacts who passed the bogus money onto the public. After the distribution was completed, Handelman sent approximately $20,000 of genuine currency to Noble via Federal Express as his share in the profits of the distribution. In October of 1981, Handelman asked Noble to send additional money with different serial numbers and a different Federal Reserve Bank inscribed thereon because in his opinion the first package's bills were becoming too well known in the Chicago area. The defendant responded by sending a second package of counterfeit bills with different serial numbers via Federal Express. Shortly thereafter, on October 19, 1981, Bennett Handelman and another individual were arrested while delivering approximately $33,750 in counterfeit money to undercover agents.

In addition to his involvement with Handelman, Noble also was involved in counterfeit activity in the southwestern part of the United States. In late October of 1981, Jack Catain met with another individual, a Raymond Cohen, in a Los Angeles hotel and asked Cohen if he was interested in distributing counterfeit money. Cohen initially declined the offer after observing that the counterfeit notes did not appear to be of good quality; however, after a new printing of counterfeit notes Cohen agreed on December 5, 1981 to participate in the scheme. After Catain told Cohen that he would give him approximately $756,000 in new counterfeit notes Noble, Cohen and another individual went to Catain's office at Fox Brothers where Noble turned over approximately $1.7 million in counterfeit notes, consisting of approximately $1 million in old and $700,000 in new counterfeit bills. Since the new bills had a strong odor Noble instructed Cohen on how to eliminate the smell by drying the bills.

Cohen was arrested on December 11, 1981 in Las Vegas while attempting to distribute the counterfeit money and he immediately agreed to cooperate with the government. That same day he placed a recorded phone call to Catain's residence to arrange a meeting between Catain and an undercover agent the following day. During the meeting with Catain, Cohen wore a body recorder. The transcript of the conversation reveals that Catain referred to the "guy from Chicago" in alluding to an earlier distribution of the counterfeit money and also periodically mentioned a person named "Stuie" (Noble's first name is Stuart). Catain also agreed to meet Cohen's buyer (the undercover agent). During the meeting Catain negotiated a deal for an exchange of $100,000 in genuine currency for $200,000 in counterfeit notes. After the undercover agent stepped away from the conversation, Catain instructed Cohen on how to set up the deal, since he (Catain) wanted no direct involvement in the counterfeit transfer. Catain stated that he would send "Stuie", or some other person who knew how to detect counterfeit, to insure that the buyer's money was genuine. Catain, however, had a change of heart since he was present during the transfer of the counterfeit bills made at a Los Angeles restaurant on December 15, 1981. Catain was arrested immediately thereafter.

Approximately one week later, on December 21, 1981, a Secret Service agent in

Chicago had Bennett Handelman's wife place a call to the defendant Noble.[3] During the conversation the Secret Service agent posed as an interested buyer who wanted to continue the operation. During the conversation, the defendant made four or five exculpatory statements and denied any knowledge of Handelman's involvement in the counterfeiting scheme. At trial, Noble's attorney presented the recorded conversation as part of his defense. The government introduced and the district court allowed Noble's prior counterfeiting conviction into evidence to impeach Noble's credibility as to his claimed lack of counterfeiting knowledge under the Federal Rules of Evidence Rules 806 and 609(a)(2).

In April of 1982, Handelman agreed to cooperate with the government and turned over the second package of counterfeit money he had received from Noble. It should be noted that at the trial it was brought out during Handelman's cross-examination that he had offered to testify for Noble for a price, but that Noble refused the offer. Although Handelman was upset with the government over his earlier treatment by government agents,[4] he was evidently more upset with Noble and thus complied with the government's request to testify on their behalf. Handelman's testimony was offered by the government to establish that a conspiracy continued to exist up to and including the time of Handelman's arrest. Cohen's testimony was offered to demonstrate that the same conspiracy was still in existence and continued through Catain's arrest. Finally, the government's expert witness was able to establish that the counterfeit notes in California and in Chicago were the products of a single printing operation from the same negatives or plates.

## II.

### A. The Conspiracy.

The indictment charged that a single conspiracy existed to distribute counterfeit notes from early 1980 until the date of the indictment. The defendant, on the other hand, contends that the evidence at trial established not one single conspiracy, but rather two separate conspiracies with the "Noble-Handelman" conspiracy ending in October of 1981 when Handelman was arrested and the "Noble-Catain" conspiracy commencing thereafter and ending with the arrest of Catain. Thus, the defendant argues that it was prejudicial error for the court to admit into evidence under the co-conspirator hearsay rule Cohen's testimony regarding Noble's delivery of $1.7 million in counterfeit notes to Cohen and the taped conversation between Cohen and Catain contining references to Noble's later involvement in the counterfeiting operation after Handelman's arrest.

■ In order to establish the crime of conspiracy, the government must prove that there was an agreement between two or more persons to commit an unlawful act, that the defendant was a party to the agreement, and that an overt act was committed in furtherance of the agreement by one of the co-conspirators. *See, e.g., United States v. Madison,* 689 F.2d 1300, 1310 (7th Cir.1983), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983); *United States v. Roman,* 728 F.2d 846, 859 (7th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 1360, 80 L.Ed.2d 832 (1984). In *United States v. Varelli,* 407 F.2d 735 (7th Cir. 1969), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972), our Court discussed the factors distinguishing a single conspiracy from multiple conspiracies:

"The distinction must be made between the separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining and terminating their relationship at different times. Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the

---

**3.** The agent at this time had no knowledge of Jack Catain's arrest on December 15, 1981 on the counterfeit charges.

**4.** Handelman testified that government agents had roughed him up in an earlier incident.

conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.

"In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all of the parties constitutes a single conspiracy...."

*Id.* at 742 (citations omitted). While the parties to the agreement must know that others are participating in the conspiracy, they neither have to personally know the individuals involved, *United States v. Ras*, 713 F.2d 311, 314 (7th Cir.1983), nor do they have to participate in every facet of the conspiracy scheme. *Id.; see also, United States v. LaVecchia*, 513 F.2d 1210, 1218 (2d Cir.1975); *United States v. Cervantes*, 466 F.2d 736 (7th Cir.), *cert. denied*, 409 U.S. 886, 93 S.Ct. 108, 34 L.Ed.2d 143 (1972). As long as the conspiracy continues and its goal is to achieve a common objective, as in this case the passing of counterfeit money in Chicago and the southwestern United States, parties may still be found guilty even though they join or terminate their relationship with the core conspirators at different times. *Cervantes*, 466 F.2d at 738, *citing United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969).

▮ After reviewing the record, we are convinced that given the timing of the transactions, and the testimony of the unindicted co-conspirators, only one conspiracy existed in this case. There is no doubt that the object of the conspiracy was to produce counterfeit money from one source and distribute it to the public. Certainly, the fact that all of the counterfeit notes seized in this case were produced from the same plates or negatives indicates that there was one single on-going conspiracy to distribute counterfeit notes. *See United States v. La Vecchia*, 513 F.2d 1210, 1218 (2d Cir.1975). Further, the government presented Handelman's testimony to establish that a conspiracy existed through October, 1981. Handelman's testimony demonstrated that Noble and Luce were directly involved in the counterfeiting operation from its inception. The government then offered Cohen's testimony to establish the continuation of the same conspiracy after Handelman's arrest. In a taped conversation between Cohen and Catain, Catain acknowledged the existence of other co-conspirators who were acting as distributors in this conspiracy. Throughout this taped conversation, Catain refers to "Stuie" as the person who knew all about the problem of curing of wet counterfeit money and alludes to the person from Chicago (supposedly Handelman) who was involved in an earlier counterfeit money distribution. It was Catain, in an earlier transaction, who directed Noble to take Cohen over to Fox Brothers to pick up the $1.7 million in counterfeit cash. Finally, the government presented evidence of numerous phone contacts between Argold Press and Fox Brothers throughout the period of the alleged conspiracy, but especially during the early stages of the conspiracy in the summer months of 1981.[5]

▮ The defendant, however, argues that the admission of these telephone records, without direct evidence as to the identity of the caller and the subject of their call, constitutes reversible error. We disagree and hold that the admission of the telephone records establishing the date and time of the calls was proper pursuant to Rule 401 of the Federal Rules of Evidence. *See United States v. Atchley*, 699 F.2d 1055, 1058–59 (11th Cir.1983); *United States v. Lerma*, 657 F.2d 786, 789 (5th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 463 (1982). Telephone records are frequently and properly used as corroborating circumstantial evi-

---

5. Calls which seemed especially relevant are those made on May 18, 1981; September 1, 1981; and October 6, 1981. On these days, shortly after transfers of money between Handelman and Argold Press occurred, calls were made from Argold Press to Fox Brothers.

dence to establish the existence of a conspiracy. *United States v. Regilio*, 669 F.2d 1169, 1175 (7th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982); *United States v. Dalzotto*, 603 F.2d 642, 644 (7th Cir.1979), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979). In this case the telephone records provided relevant circumstantial evidence as to the existence of the on-going conspiracy. Previously, we noted that the government introduced evidence as to Catain's involvement in the conspiracy when in the taped conversation between Cohen and himself, Catain indicated that he had been involved in the conspiracy prior to Handelman's arrest. Further, Catain's business location at Fox Brothers Leasing was used for the storage of over 1.7 million dollars in counterfeit money. Given this evidence establishing Catain's extensive involvement and participation in the conspiracy with Noble during the latter portion of 1981, the calls are certainly relevant in establishing a prior connection between the parties as to their participation in the conspiracy.[6]

▮▮▮ Even if we were to assume that the evidence disclosed two conspiracies instead of one as alleged in the indictment, the variance between this evidence and the indictment is harmless. Where there exists a variance in proof from the indictment, the error must be prejudicial in order for the defendant to prevail. *See Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In this case, the defendant was the only person on trial who had participated in both conspiracies (*compare Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) *with Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) and, thus, if two conspiracies did exist, which we do not hold, the evidence clearly establishes that

Noble was involved in each of the conspiracies. It should be noted that a problem exists only when allowing the introduction of evidence of another conspiracy where more than one person is on trial and where the government alleges that the other person was involved in only one of the conspiracies. If that is the case, "the dangers of transferance of guilt from one to another across the line of separating conspiracies, subconsciously or otherwise ..." would be present. *Kotteakos*, 328 U.S. at 774, 66 S.Ct. at 1252. However, no danger of this nature exists in this case since Noble was the only person on trial and the evidence clearly demonstrated that he was extensively involved in the conspiracy throughout the time charged in the indictment. Thus, any variance from the indictment presented and the proof elicited at trial must be deemed harmless error.

**B. Admission of Prior Conviction.**

The defendant next claims that the admission of his prior conviction for counterfeiting was so prejudicial as to merit reversal of his conviction. At trial, Noble's defense counsel introduced the taped conversation between Agent Parmalee and the defendant wherein the agent posed as one of Ben Handelman's counterfeit distributors. During the conversation, the agent attempted to convince Noble to continue with the counterfeiting operation even though Handelman had been arrested; however, Noble denied on four or five occasions any knowledge of counterfeiting operations or of his prior counterfeiting activities with Handelman. The government then moved to impeach the defendant's statements with the introduction of the defendant's prior counterfeiting conviction. The district court allowed the prior conviction to be received into evidence pursuant to Fed.R.Evid.Rules 806 and 609(a)(2).

---

**6.** The defendant argues that the admission of the summary of telephone contacts into the record violated the defendant's due process rights since the prosecutor knew that the evidence was false and allowed it to go uncorrected. The defendant, however, fails to state in his brief the basis for this bold unsupported assertion. The government notes in its brief that the

defendant suggested at trial that Jack Catain was in a hospital during portions of 1981 such that it was possible that he did not make the phone calls from Fox Brothers to Argold Press. But, the defense never introduced any evidence to establish that Jack Catain was confined in a hospital and if he was, for what period of time.

When Noble's counsel introduced the taped conversation into evidence containing the defendant's exculpatory hearsay statements, the defense counsel made the defendant's credibility an issue. *See United States v. Lawson,* 608 F.2d 1129, 1130 (6th Cir.1979) (proper to impeach defendant when his counsel brought out on cross-examination of a government agent the defendant's denials of any involvement in the counterfeiting scheme); *see also United States v. Bovain,* 708 F.2d 606, 613 (11th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 551, 78 L.Ed.2d 724 (1983). Federal Rules of Evidence Rule 806 provides that when a hearsay statement has been admitted into evidence, the credibility of the declarant may be attacked by evidence "which would be admissible for those purposes if declarant had testified as a witness." The Advisory Committee Notes to the proposed rule state that:

"[t]he declarant of a hearsay statement which is admitted into evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified. *See* Rules 608 and 609...."

Federal Rule of Evidence 609(a)(2) provides for the admission of a prior conviction involving a false statement:

"For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime ... (2) involved a dishonest or false statement, regardless of the punishment."

The notes of the Conference Committee defines "dishonesty and false statement" to mean "crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretenses, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully." Conf.Rep. No. 1597, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 7051, 7098, 7103. Counterfeiting is an offense in the nature of *crimen falsi. See Black's Law Dictionary* (5th ed. 1979); *see also, Kaye v. United States,* 177 F. 147 (7th Cir.1910). We agree with the district court's decision that the prior counterfeiting conviction was admissible.

Contrary to the defendant's assertion, the district court need not balance the prejudicial effect of the admission of the prior conviction against its probative value when admitting such evidence under Fed.R. Evid.Rule 609(a)(2) for the purpose of impeachment. *United States v. Kuecker,* 740 F.2d 496, 501 (7th Cir.1984); *see also, United States v. Wong,* 703 F.2d 65, 67 (3d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 140, 78 L.Ed.2d 132 (1983); *United States v. Kiendra,* 663 F.2d 349, 354–55 (1st Cir.1981).[7] The defendant, however, argues that we previously urged district courts to engage in a balancing test by weighing the prejudicial effect of admitting a prior conviction against its relevance. *See United States v. Mahone,* 537 F.2d 922, 929 (7th Cir.1976). However, *Mahone* concerned the admission of evidence under Rule 609(a)(1), which explicitly requires a balancing test, and not Rule 609(a)(2) the statute applicable to the fact situation in this case. The district court in this case, following the admission of the evidence, properly instructed the jury that the defendant's prior conviction is to be considered only for purposes of impeachment and is not to be considered as evidence of his guilt. *See United States v. Dow,* 457 F.2d 246, 250 (7th Cir.1972); *United States*

---

**7.** The legislative history of Federal Rule of Evidence 609(a)(2) clearly discloses that no balancing test is required:

"The admission of prior convictions involving dishonesty and false statement is not within the discretion of the Court. Such convictions are peculiarly probative of the credibility and, under this rule, are always to be admitted."

H.R.Rep. No. 1597, 93rd Cong., 2d Sess. 9, *reprinted in,* 1974 U.S.Code Cong. & Ad.News 7098, 7103; *see also,* 120 Cong.Rec. 40, 891 (1974) (Statement of Rep. Hungate presenting the Conference Report on H.R. 5463 to the House for final consideration), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7108, 7110–11.

*v. Brashier,* 548 F.2d 1315, 1326 (9th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). Thus, it was proper for the district court to make known to the jury the nature of the defendant's previous conviction.

## C. Other Issues.

 The defendant asserts that "Handelman showed such a flagrant disregard for the truth that his testimony should have been stricken in its entirety." Defendant's brief at 13. During his cross-examination, Handelman admitted that he had attempted to sell his testimony to Noble. However, the credibility of the witness is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances. *See United States v. Tanner,* 471 F.2d 128, 135–36 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). In this case, Handelman's testimony concerning Noble's involvement was corroborated by Federal Express receipts, wire transfer receipts, telephone summaries, and the testimony of an employee of Argold Press. Further, the defense counsel thoroughly cross-examined Handelman. Although the record discloses that Handelman was not the perfect witness, under the circumstances of this case, his credibility was properly an issue for the jury to resolve.

 Noble next contends that part of the reason for the severity of the sentence imposed was to punish him for his refusal to provide the government with information as to others involved in the conspiracy and his failure to turnover the plates used in the counterfeit operation. Thus, he argues that the sentence imposed is in violation of his Fifth Amendment right against self-incrimination. The defendant's contention is without merit.

The record in this case clearly demonstrates that Judge Hart considered the defendant's pre-sentence investigation; the extent of his active participation in the counterfeiting scheme; and his apparent lack of remorsefulness and rehabilitation, as he apparently decided to engage in further counterfeiting operations shortly after his release from prison for his first counterfeiting conviction. Judge Hart also expressed concern that the plates had not been retrieved by or turned over to the government and thus the possibility still exists that they could be used again in future counterfeiting operations. The record shows that the district court considered all of this evidence and came to the conclusion that the defendant had not resolved to reform his conduct. "It is well established in this circuit and elsewhere that:

> 'The general rule on review of sentences in the federal courts is: once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end, unless the sentencing judge relied on improper or unreliable information in exercising his or her discretion or failed to exercise any discretion at all, in imposing [the] sentence.' "

*United States v. Madison,* 689 F.2d 1300, 1312 (7th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983) (citation omitted). *See also* 18 U.S.C. § 3577; *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Johnson,* 507 F.2d 826, 829 (7th Cir.1974), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975). The factors considered by the district court in imposing the sentence in this case were proper and thus it did not abuse its discretion in imposing the two consecutive six-year terms.[8] *See, e.g., United States v. Glassey,* 715 F.2d 352, 354 (7th Cir.1983).

### III.

On appeal, Noble now argues through substituted counsel that his conviction should be reversed and remanded for a new trial because his original counsel had a conflict of interest created by his representation of Jack Catain in a later trial. Noble

---

**8.** The maximum sentence for each violation of 18 U.S.C. § 473 is ten years.

further argues that he was provided with ineffective assistance of counsel at trial. We will initially address the claimed conflict of interest argument.

A defendant is entitled to an attorney who is free of any actual conflict of interest in representing the defendant's case. *See Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980); *United States v. Bradshaw,* 719 F.2d 907, 911 (7th Cir.1983). This right, however, may be waived by the defendant. *See Holloway v. Arkansas,* 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 1178 n. 5, 55 L.Ed.2d 426 (1978); *Bradshaw,* 719 F.2d at 911. To be effective, this waiver must be knowingly and intelligently made. "'The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Bradshaw,* 719 F.2d at 911 *quoting Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (*Bradshaw* adopted the "knowing and intelligent" standard of *Zerbst* for determining the right of conflict-free representation). In determining whether a waiver was knowingly and intelligently made, the court is concerned "with whether the trial judge (or someone else) provided sufficient information or advice to permit a choice between meaningful options...." *United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431, 435 (7th Cir.1983) (citations omitted). "'A truly knowing and intelligent waiver accepted by the court will insulate the conviction from later attack....'" *Bradshaw,* 719 F.2d at 911 (citations omitted).

In this case, the government initially filed the motion to disqualify the attorney for Noble because of his simultaneous representation of Jack Catain in a related case pending in the Central District of California. The parties submitted briefs on their respective positions and on December 22, 1982, the court held an extensive hearing in the presence of all parties, including the defendant Noble, to define and investigate all of the possible ramifications of a conflict of interest, and to determine whether the defendant still wished to be represented by his then trial counsel if in fact a conflict did exist. Because the defendant's counsel was representing Jack Catain in a later trial in California, the government informed the district court that it believed there could be three potential areas of conflict: (1) the plea negotiations where any possible plea bargain would involve Noble testifying as to Jack Catain's involvement in the conspiracy at a later trial; (2) during the trial where the government would attempt to introduce the co-conspirator statements of Jack Catain; and (3) the sentencing of the defendant where the government felt that defense counsel might be unable to shift the responsibility to Catain. All three potential areas of conflict were discussed and thoroughly evaluated by the Court at the hearing. The district court judge extensively questioned Noble's counsel as to the possible areas of conflict. He then asked Mr. MacCarthy, the Administrator of the Federal Defender Program in Chicago who was appointed by the district court to evaluate, interview and explain to Noble the ramifications of having his defense counsel represent both himself and Catain, to give his conclusions as to any possible conflict of interest. Mr. MacCarthy reported to the district court, in general terms in order that he not violate a confidence, the nature of his discussions with Noble, especially those involving possible conflicts concerning the plea bargaining. Mr. MacCarthy noted that the conversations which he had with the defendant were in the presence of the defense counsel. He concluded his presentation with a recitation of his evaluation noting that "I am totally certain that if there is a conflict, I don't know that there is, I don't see one right now on the basis of my conversations with Mr. Noble, but if there is a conflict, there is no question in my mind but that Mr. Noble is aware of everything and certainly is much desirous of having Mr. Twitty represent him and would be of a mind, if permitted to do so, to waive whatever conflict might exist. That I am certain of. That is

about the only thing I am positive of in this case." The district court then turned to the defendant Noble and engaged in the following colloquy:

"THE COURT: All right, Mr. Noble, if you will step before the Court at this time, you have heard the discussion here that I have had with counsel?

DEFENDANT NOBLE: Yes, I have, your Honor.

THE COURT: How old are you, sir?

DEFENDANT NOBLE: Thirty-seven.

THE COURT: What kind of work have you done in your life?

DEFENDANT NOBLE: Printing.

THE COURT: How much education have you had?

DEFENDANT NOBLE: High school.

THE COURT: Do you understand what I have been talking about with these lawyers here today?

DEFENDANT NOBLE: Yes, I do, your Honor.

THE COURT: You understand that my concern is that you be properly represented by an attorney who has no conflict of interest?

DEFENDANT NOBLE: Yes, I do.

THE COURT: Do you understand that?

DEFENDANT NOBLE: Completely.

THE COURT: And do you understand that these are serious charges against you that the government has brought?

DEFENDANT NOBLE: Yes, I do.

THE COURT: And do you understand the risk of imprisonment involved in a conviction in a case like this?

DEFENDANT NOBLE: Yes I do.

THE COURT: And it is your desire to continue to have Mr. Twitty represent you?

DEFENDANT NOBLE: Absolutely.

THE COURT: Okay, and you have fully and completely discussed this matter with Mr. MacCarthy and Mr. Twitty, is that right?

DEFENDANT NOBLE: Yes, I have, your Honor.

THE COURT: Do you want to talk any further with Mr. MacCarthy at this time before I enter any rulings in this matter, or are you satisfied that you have had a full and complete discussion?

DEFENDANT NOBLE: Yes, I am.

THE COURT: And you understand the implications that are involved in the questions that I have asked the attorneys here, and particularly Mr. Twitty and the United States Attorney this morning?

DEFENDANT NOBLE: Yes, your Honor."

In his reply brief, the defendant implies that because his trial counsel was present during his conversations with Mr. MacCarthy, he was unable to make a knowing and intelligent waiver of counsel. He further contends that the district court never specifically asked him if he was willing to waive his rights. We find that both contentions lack merit. The defendant's initial argument seems to suggest that the defense counsel had such control over the defendant so as to preclude him from making a free choice while his counsel was present. The inference that the attorney had such a vested interest in the case that he somehow persuaded the defendant to keep him as his attorney despite the possibility of a conflict is a bit strange. There is no evidence of any such control in the record or of any improper conduct on the part of the defense attorney. Even now, when he has other counsel representing him, Noble fails to demonstrate how the presence of his former counsel during the meetings with Mr. MacCarthy impinged upon his freedom of choice.[9]

▮▮▮ It was Mr. MacCarthy's opinion from private discussions with Noble that he (Noble) truly desired that his attorney remain as his counsel. Further, Noble was present at the hearing when the potential areas of conflict were thoroughly discussed. The district court then extensively

---

9. Certainly, nothing stopped the defendant from notifying the district court of his desire for another attorney when his attorney was not present, either orally or by mail.

examined Noble at the hearing after Mr. MacCarthy's clear and concise statement to the court of Noble's intention to retain his trial counsel. We are to examine each claim of waiver on a case-by-case basis, including all the facts and circumstances of the case. *Bradshaw,* 719 F.2d at 911. We fail to understand how Noble could expect the district court judge to do anymore than was done in this case to protect his rights. Thus, from our review of this record we are convinced that the defendant effectively waived his right to now challenge his counsel's alleged conflict of interest. *See United States ex rel. Tonaldi v. Elrod,* 716 F.2d at 437.

■ The defendant next claims that his trial counsel committed an egregious error when he produced the tape containing the conversation between the defendant and Agent Parmalee, thus subjecting the defendant's statements to impeachment through the use of his prior counterfeiting convictions. Specifically, Noble points to a statement made by his trial counsel indicating that the trial counsel was unaware of the ramifications of Fed.R.Evid.Rule 806 when used in conjunction with Rule 609(a)(2) to admit his prior conviction.[10]

Recently the Supreme Court in *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) detailed the analysis required when a defendant claims that he was denied effective assistance of counsel at trial. The analysis involves two steps.

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Id.,* 104 S.Ct. at 2064. Under the first prong of the analysis, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 2065. This showing includes identifying "the acts or omissions of counsel that are alleged not to have been the results of reasonable and professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 2066. The second prong of the analysis requires that the defendant "affirmatively prove prejudice." *Id.* at 2067. This requires that "there is a reasonable probability that but for counsel's unprofessional errors, the results of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 2068. In setting out this two pronged analysis the *Strickland* Court noted that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 2069.

We need not address the issue of whether the defense counsel's conduct "fell below an objective standard of reasonableness" when it presented the exculpatory statements of the defendant, thus subjecting him to impeachment through the use of his prior counterfeiting conviction. After analyzing the record, we hold that Noble was not prejudiced by his trial counsel's alleged improper conduct since the evidence of his guilt was overwhelming. In determining whether there exists a "reasonable probability" that the results of the trial would have been different but for counsel's unprofessional errors, the Supreme Court in *Strickland* cautioned that courts are to assume that the jury acted in

---

**10.** Trial counsel's comment when he learned that the court was allowing the use of the conviction was: "quite frankly, I have to admit to being caught flat-footed as to this. I cannot believe, although I haven't [sic] heard it, that it is being done. I am totally shocked and absolutely unprepared that this would happen and that this would be admitted...."

accordance with the law by "reasonably, consciously, and impartially applying the standards that govern the decision." *Id.* at 2068. Thus, in this case we can assume that the jury properly weighed the evidence and followed the district court's instruction that the prior conviction is only to be considered in assessing the credibility of the defendant. The evidence in this record discloses that two witnesses, who themselves were extensively involved in the conspiracy, testified as to the defendant's extensive participation. Although their credibility was vigorously attacked by Noble's defense counsel in cross-examination, much of their testimony was corroborated by independent evidence. This independent evidence consisted of telephone summaries documenting the destination of phone calls between Argold Press, Fox Brothers, and Ben Handelman's residence; wire transfer receipts; canceled checks; expert testimony establishing that the counterfeit seized from Handelman in Chicago and in Las Vegas were manufactured from the same set of plates; the defendant's fingerprints on the packaging of the counterfeit; an employee of Argold Press, which was owned by Noble, testifying as to the late hours which the shop was running during periods of the conspiracy; and taped conversations between Cohen and Catain implicating Noble as the printer in the counterfeit operation. Based upon the totality of evidence and circumstances presented in this case clearly establishing the defendant's participation in the counterfeiting scheme, we are confident that the outcome of this trial would not have been different even if Noble's counsel had not introduced the tape containing Noble's exculpatory statement, which opened the door for the government to introduce his prior conviction under Fed.R.Evid.Rules 806 and 609(a)(2).

### IV.

The decision of the district court is AFFIRMED.